2010 WY 87

**Robert Allan SWEET, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

No. S–09–0021.

Supreme Court of Wyoming.

June 28, 2010.

Representing Appellant: Diane Lozano, Wyoming State Public Defender; Tina Kerin, Appellate Counsel; Wyoming Public Defender Program. Argument by Ms. Kerin.

Representing Appellee: Bruce A. Salzburg, Wyoming Attorney General; Terry L. Armitage, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Jenny L. Craig, Assistant Attorney General. Argument by Ms. Craig.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, BURKE, JJ.

GOLDEN, Justice.

[¶ 1] In this appeal, Robert Allan Sweet, convicted by a jury of one count of sexual abuse of a minor in the second degree, in violation of Wyo. Stat. Ann. § 6–2–315(a)(ii) and (b) (LexisNexis 2009),[1] raises three issues in his effort to overturn the judgment and sentence of incarceration of not less than 30 months nor more than 102 months, with credit for 315 days of presentence confinement. Sweet and the State agree that, generally stated, the three issues are whether the State presented improper vouching evidence; whether the district court's Jury Instruction No. 11 was improper; and whether cumulative error occurred because of alleged improper victim impact testimony, alleged judicial and prosecutorial bias in favor of the alleged victim, admission of alleged irrelevant evidence, and the prosecutor's multiple references to sexual assault. Because Sweet did not object at trial with respect to any of these issues, we shall apply our plain error standard of review in each instance.

[¶ 2] For the reasons set forth below, we hold that the State's presentation of improper vouching evidence constituted plain error and, therefore, we reverse and remand for a new trial. Although resolution of this issue is dispositive of this appeal, we shall also address the remaining issues because they may recur on retrial.

## GENERAL STATEMENT OF FACTS

[¶ 3] On November 29, 2007, thirty-seven-year-old Sweet was living in a trailer in Gillette, Wyoming, with a number of individuals, including CB and CB's twelve-year-old daughter, SM. SM stayed home from school that day because she was feeling ill. Her mother and the others, except Sweet, left the trailer to take the children to school. As SM lay on a recliner in the front room watching a video, Sweet was sleeping on the couch in the front room. SM fell asleep in the recliner and was allegedly awakened by Sweet who was pushing her shoulder and grabbing her hands and holding them above her head. According to SM, Sweet began to touch her breasts on the inside of her clothing, unzipped his pants and pulled out his penis, and told her not to tell anyone. SM said Sweet tried to pull down her pants, but she resisted his effort by pressing into the recliner. SM said she was screaming and trying to kick Sweet between his legs. She said Sweet had been drinking as she could smell it on him. According to SM, Sweet started crying, stopped what he was doing, and went into the bathroom. When SM's mother returned home, SM told her what happened, and her mother angrily confronted Sweet and called the police. Sweet left the trailer and was shortly apprehended by law enforcement personnel inside a residence in the neighborhood. After being taken into custody, Sweet was transported by a deputy sheriff to the sheriff's department, interviewed, and placed under arrest.

[¶ 4] On November 30, 2007, the prosecutor filed a felony information charging Sweet with one count of sexual abuse of a minor in violation of Wyo. Stat. Ann. § 6–2–315(a)(ii) and (b). On December 6, 2007, Sweet waived his right to a preliminary hearing and was

---

1. **§ 6–2–315. Sexual abuse of a minor in the second degree; penalties.**

 (a) Except under circumstance constituting sexual abuse of a minor in the first degree as defined by W.S. 6–2–314, an actor commits the crime of sexual abuse of a minor in the second degree if:
 * * * *

 (ii) Being sixteen (16) years of age or older, the actor engages in sexual contact of a victim who is less than thirteen (13) years of age;
 * * * *

 (b) A person convicted under subsection (a) of this section is subject to imprisonment for not more than twenty (20) years, unless the person convicted qualifies under W.S. 6–2–306(e).

bound over to the district court. He was arraigned on February 7, 2008, and entered a plea of not guilty to the charge. On February 11, 2008, he filed a motion to suppress recorded statements made on November 29, 2007, to sheriff's deputy Duane Peyrot, alleging that any statements were not voluntarily made because of his alcohol consumption. The State filed its traverse to this suppression motion on March 11, 2008. The district court filed its order denying the motion on April 22, 2008.

[¶ 5] On June 9, 2008, Sweet's jury trial began, and on June 10, 2008, the jury returned a verdict of guilty. The district court held a sentencing hearing on October 9, 2008, and entered sentence on November 14, 2008. Sweet timely filed a notice of appeal on November 19, 2008. Additional facts relevant to each of the three issues before us are set forth as necessary below.

## DISCUSSION

*Issue One: Whether the State presented improper vouching evidence.*

### Background Facts

[¶ 6] In the State's pretrial exhibit list, the prosecutor listed the compact disc recording of the interview between Deputy Duane Peyrot and Sweet conducted in an interview room in the sheriff's department in the early afternoon of November 29, 2007, the day of the alleged incident giving rise to the charge against Sweet. Sweet's defense counsel had moved before trial to suppress the recording but only on grounds that Sweet's statements during the interview were involuntary, which motion the trial court had denied. Defense counsel made no other objections to the admissibility of the recording, did not move in limine to redact any portions of the recording, and did not offer any cautionary jury instructions or admonitions concerning the recording.[2]

[¶ 7] During jury selection, the prosecutor informed the prospective jurors that they would get to hear Sweet's recorded interview. After the jury was empanelled, the

prosecutor made his opening statement. In the course of that statement, he commented on Deputy Peyrot's recorded interview with Sweet. The prosecutor stated that after Deputy Peyrot had talked in detail with SM and her mother, Deputy Peyrot returned to the sheriff's department and interviewed Sweet. The prosecutor then stated:

> **You will get to hear the deputy's impressions of Mr. Sweet as he sat there at that table;** the fact that it was obvious to him that he had been drinking. You will get to hear Mr. Sweet's words as he responds to the questioning process. As I recall it, that interview takes approximately a half hour. And I will request that you pay very, very close attention to that recording for a couple of reasons.

> First, we think that you will see a shift in position by Mr. Sweet as the interview takes place. We think you will see that he was able to understand the questions that he was asked; that he was able to defend the positions he took at various times during the interview, and we think toward the end of it **you'll begin to hear a couple of things that become significant to you.**

> First of all, he'll agree he had a close relationship with the young girl, nearly a father/daughter type of relationship.

> Second, **we believe that you'll hear that he believed she's truthful.**

> Third, you'll be able to hear Mr. Sweet thought he might have done something in his sleep.

> Now, of significance to this case—well, let me back up just a little bit. Now, **you'll be able to hear the entirety of that recording during Mr. Peyrot's testimony,** and I may use it again in my closing argument. But I must ask you to pay very close attention to that, because even though you'll be allowed to take the recording into the jury room, you will not get to play it again. So **it is significant evidence, and you need to concentrate on it.** [Emphasis added.]

---

2. W.R.E. 105 provides "[w]hen evidence is admissible as to one (1) party or for one (1) purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly."

[¶ 8] Defense counsel did not object to the prosecutor's opening statements. But, defense counsel did address in his opening statement what he called Sweet's "so-called confession." He asked the jurors to listen very carefully and "to keep really careful notes of the things said in that." He then stated:

One of the things that I'd like you to watch for is to see if Mr. Sweet ever says that I did this. You're never going to hear that. In fact, he says he didn't do it. He didn't do it. He says, Well, he admitted he might have been—done it in his sleep. No, that's not exactly right, and you'll have to be the judges of that, not me.

That what he says is that at one point, Well, if I did it, I must have been—I must have been asleep. Because he is denying that this ever happened, and that's what you're going to hear, and that's what— that's what it actually is. Mr. Peyrot is a very good questioner and very experienced, and you'll hear that, too. But you will not hear a confession out of it for this particular offense....

[¶ 9] Following the opening statements, the State presented its case-in-chief. The prosecutor called as witnesses, in order, SM; SM's mother, CB; John Wilkey, at whose residence Sweet was located after leaving the trailer when SM's mother angrily confronted him; Deputy Sheriff Kim Benedict, who drove Sweet to the sheriff's department after he had been taken into custody at Mr. Wilkey's residence; and Deputy Sheriff Duane Peyrot, who interviewed both SM and Sweet on the day of the alleged incident.

[¶ 10] Because the appellate issue of improper vouching focuses on Deputy Peyrot's statements concerning Sweet's mendacity and guilt and SM's truthfulness appearing in his recorded interview with Sweet, we shall begin with a review of relevant portions of the prosecutor's direct examination of Deputy Peyrot which explored both the deputy's interview of SM and his interview of Sweet. In response to the prosecutor's preliminary questions, the deputy testified briefly about his fifteen years in law enforcement which included the most recent eight years as a felony investigator. The prosecutor then questioned the deputy about his interview of SM and SM's mother at their residence:

Q. And did you go inside the residence?

A. I went inside where I met [CB], introduced myself to her. She introduced me to [SM]. Those are the two people in the house at the time.

Q. All right. Once you'd been introduced to both of them, what did you do, sir?

A. Well, briefly I talked to [CB]. She was very animated. She was angry. Her hand was bleeding. She was talking very rapidly, and she explained to me what she had done.

Q. All right. After talking with her, what did you do then?

A. After—after talking to her briefly, I introduced myself to [SM]. I told [SM] that one of the jobs that I did, in addition to everything else she understood police officers to do, was that **frequently I worked with children, and frequently I worked with children who are involved in cases like the one that we thought we had on our hands at the time.**

I asked [SM] if her and I could talk. At the beginning of that she decided she wanted her mother to be present, so we sat in the living room where we started to talk. Shortly after [SM] started, and I started to get down to the nuts and bolts of our conversation, [her mother] excused herself.

Q. Do you have any idea as to why she did that?

A. Well, I was encouraging her to, just because my experience with young ladies is that they're a little more comfortable—if they're comfortable with me, they're comfortable with me without a parent; but also [her mother] was extremely angry, and I didn't want her to influence [SM] by saying things or by exploding when a certain something come out of [SM's] mouth. So it worked out good for both of us she wanted out of there.

Q. Can you estimate for the jury just how long it was that you interviewed [SM] that day?

A. Well, ... I think between 35 to 40 minutes.

\* \* \* \*

Q. All right. **Have you had specialized training in interviewing children?**

A. I have.

Q. About how much, sir?

A. Basic interview schools that police officers go to especially as they become investigators or detectives are general in nature and, therefore, not specifically designed for children. I've been to at least two of those.

In November of 2005 I went to Minnesota to a college to a special class, **forensic interviewing of children** put on by the national organization called Corner House, and that training includes especially conversations and interview techniques and ideas and situations to use especially with younger children. After about five minutes of talking to [SM], I decided not to do so much of a formal forensic interview with her like I would if she was younger.

Q. And you made that decision based on her responses to your questioning at the early phase?

A. I did. As we got to know each other a little bit, one of the things that I went through with [SM] was that I'm a police officer and that I deal with kids and that I understand that kids aren't like adults and they can't all the time stand straight up and look you in the eyes and answer questions.

I let her know that if I got something wrong, if I was reading something I thought she said, if I got it wrong or if I misunderstood her, she was completely okay to correct me. She was to line me out if I was even making her uncomfortable or misinterpreting her. **I asked her if she knew the difference between what the truth is and what the lie is.** By the Corner House standards, if you go through those kind of initial questioning with a kid, what you're trying to do is find out how comfortable the child is talking to an adult, talking to an adult in uniform carrying a firearm. And it wasn't too long where I was pretty comfortable. I thought [SM]— I thought [SM] was ready to get going about the nuts and bolts of what I was

there to talk to her about, and I kind of skipped over the rest of it.

Q. So would it be fair to characterize your interview with her then as essentially that of a near adult?

A. I think that's fair, yes.

Q. Could you estimate for the jury **during your entire career how many children that you've interviewed regarding sex crimes?**

A. Well, for—since January of 2000 I have been responsible for probably 90 percent of the sex crimes investigated at the sheriff's department, probably 95 percent of those involving children. **Children victims, technically under the age of 18 are juveniles, probably I would say 125 to 150 victims.**

Q. Go ahead, please.

A. **Since receiving the specialized training in interviewing children,** probably—**probably 50 children since about the fall of '05** since I had the specialized training.

Q. So the grand total would be what approximately?

A. 125 to 150.

Q. All right. Now, did there come a time when you talked with a gentleman by the name of Robert Sweet?

A. Yes, there was. [Emphasis added.]

[¶ 11] At this point in the prosecutor's direct examination of Deputy Peyrot, the prosecutor had him identify Sweet in the courtroom; identify that the recorded interview of Sweet took place in the sheriff's department; and describe the interview room, its lighting, and its furniture. Next, the prosecutor had the deputy identify for the record the CD interview recording and moved its admission into evidence. The prosecutor then played the recorded interview between the deputy and Sweet.

[¶ 12] The parties have not provided the Court with a transcript of the recorded interview. The Court has, however, listened carefully to the recording. Its playing length is twenty-nine minutes, fourteen seconds. The following excerpts from that recording are the ones of most interest with respect to the improper vouching issue. After brief intro-

ductions, Deputy Peyrot said, "Let me tell you what's going on ... but I think you know, I just came from talking to [SM]—uh—she told me a story and I think you've done something very dumb today and, uh, and that's why I'm here to try to straighten out with you—because either dumb or planned—and I hope it's not planned." Here, Sweet interjected "I didn't do anything." Deputy Peyrot goes on, "Ok, we're going to do this the right way because I know that's not true and I know you remember." The deputy then informed Sweet why he was in custody and that he could not leave. The deputy then said, "I know you've had a hard day and I know you've done some things today that you normally wouldn't have done." Sweet again interjected, "I didn't do anything wrong." The deputy continued, "My job is to find out what led you to some poor choices today. Ok, so with that in mind, I'm going to go ahead and read you your rights." Following that advisement, Sweet agreed to have a conversation with the deputy. The deputy briefly related his investigation which included talking to SM and SM's mother. The deputy then said that SM seemed to him like a very nice young lady.

[¶ 13] The deputy and Sweet then talked about Sweet's drinking and events preceding the alleged incident. The deputy then stated that he had talked to SM and her story was the only one the deputy had so far, and Sweet was the only one who could tell his story. The deputy and Sweet then briefly talked about Sweet's having left the trailer because SM's mother had angrily accused him of raping SM, and the deputy stated he knew it wasn't true that Sweet had done that. Then Deputy Peyrot stated, "My only interest here is the truth." For the next five minutes of the recording, Sweet spoke generally about the events of the morning including SM's mother taking the other children in the trailer to school; SM's being sick and staying home; his being asleep; the friendship and trust between him and SM; and that he did not rape or touch SM. The deputy then stated that, in view of that relationship built on trust, the deputy was left with confusion why what happened with SM happened, unless alcohol got the best of Sweet. At this, Sweet asked, "What did she say happened?"

Deputy Peyrot then related what SM had told him, including the size of Sweet's penis. Sweet replied that he does undo his jeans (when sleeping). The deputy stated there was only one way SM knew about Sweet's penis and that was because "she's telling me the truth and you've made a gravest mistake today, a huge mistake today ... and lost control of yourself somehow, which is very unfortunate, I got to tell you [SM's] heart is broken...."

[¶ 14] Throughout the deputy's statements, Sweet stated that he was sleeping and nothing happened. Deputy Peyrot then stated that he knew Sweet was not sleeping and Sweet felt bad about what happened. The deputy asked if Sweet had any remorse about what happened; Sweet said nothing happened; and the deputy stated, "I know that you did, I know that [SM] saw your penis this morning." Sweet replied that SM was wrong, to which Deputy Peyrot rhetorically asked, "She's a liar," and Sweet stated he won't call her a liar. The deputy next stated that he has had a lot of experience with men who live with single moms with kids and become their best friend for purposes of sexually taking advantage of their children. The deputy stated that there are only two ways for what happened, one is that Sweet planned and organized it or he made a bad decision. After stating he wondered if he needed to talk to every young lady Sweet had been around, the deputy said, "Well, I know this happened today, I know you reached in her shirt and felt her boobs"—Sweet interjected, "No, I did not"—I know that you unzipped your pants and took your penis out, ok, because there's only one way twelve-year-old [SM] who adores you like a father saw your penis and that's that her story is true and you're feeling holy shit what happened today."

[¶ 15] After further conversation concerning Sweet's leaving the trailer and going to another trailer that he was not supposed to be in, SM's statement to the deputy, and Sweet's denial, Deputy Peyrot said this was not a situation where Sweet was going to "insult [SM's] honesty ... my intelligence ... and your own dignity by telling me that you were asleep...." Sweet then stated he

has a history of sleepwalking; he said, "maybe I did it in my sleep, I don't know." Sweet said, "I might have done it, but I was sleeping." He said, "If it happened, I will not disrespect what she said, but I apologize very much so because ... I did, I went to sleep." After stating Sweet was claiming it happened in his sleep, the deputy said, "Yet, I know it happened and you're saying, maybe, Duane, I did it in my sleep." The deputy said that even in his biggest drinking weekend he never grabbed a twelve-year-old girl and told her, "Don't ever tell anybody about this and took my penis out, that's what happened this morning and I want to know why." Sweet responded that he didn't believe the deputy and didn't believe SM. Sweet then said if it happened, he was extremely sorry, but he didn't believe it did, because he was asleep. Deputy Peyrot then said that the only deviation between what SM had told him and what Sweet was telling him were the things that were trouble for a thirty-seven-year-old man. Sweet replied he did not touch SM, to which the deputy said, "Well, I believe that you did." When Sweet reiterated that he was not lying, the deputy replied, "I gotta tell you I'm not lying either. I believe the things that [SM] told me." The deputy told Sweet he was not buying his sleepwalking. Sweet again said nothing happened. Apparently at this point in the interview, Deputy Peyrot momentarily left the room.

[¶ 16] When the deputy resumed his interview, he again reviewed what SM had said about Sweet's penis and that he didn't think she was making a false report. When Sweet said he didn't recall doing anything, the deputy said, "You see the problem I'm in because I believe her hundred percent." In concluding the interview, Deputy Peyrot said:

> You know what, this is what I'm going to do, ok, I'm going to arrest you based upon the things that [SM] said. [SM] said, "He tried to rape me." I think that's true and that's what you're going to jail for. And, you know what, when we're talking about being decent ... ok, I think that you need to be decent enough to admit that there was a mistake made today.

[¶ 17] Following the playing of this recorded interview, the prosecutor continued his direct examination of the deputy and asked questions about the deputy's perceptions of SM:

Q. All right. Thank you. Now, sir, you were present in the courtroom when [SM] testified earlier today, were you not?

A. I was.

Q. You had a chance to observe her demeanor and how she related to being talked to by myself and by [defense counsel].

A. I did.

Q. Could you contrast and compare that with how her mannerisms were when she talked with you in her mother's residence on November 29, sir?

A. Well, [SM's] demeanor was quite a lot different with me. I have had—excuse me—**I've had just a lot of success talking with kids over my career. I think that's both related to the training, the fact that I'm a dad, the fact I'm pretty empathetic. [SM] and I talked for that 40 minutes. I felt like she was comfortable talking to me. I felt like she was truthful talking to me.** I felt like she was—the things she was saying to me, relating to me as facts, fit the situation as I observed them, you know; as you can compare facts being stated to you to the environment and to the feeling you're getting as you're talking to the person.

Q. And how about her volume of voice when she talked with you at the residence, sir?

A. Well, she's—she's a 12-year-old girl talking to a strange adult male, of which I learned there wasn't a lot of adult males in her life, especially any that would be anything close to a role model. **But I thought she made good eye contact. I thought—I thought she was decisive in answering my questions when I would say, who, where, what, how.**

Q. Did she display any inconsistencies in the interview that you conducted with her?

A. No, she didn't. [Emphasis added.]

[¶ 18] At this point in the deputy's direct examination, after a side-bar among the

prosecutor, defense counsel, and the trial judge, the prosecutor continued his direct examination of the deputy to address apparent inconsistencies in SM's earlier cross-examination testimony brought out by Sweet's defense counsel. The prosecutor addressed these matters by having Deputy Peyrot recount SM's interview statements to him on those specific points brought out under defense counsel's cross-examination of SM. At the conclusion of that direct examination, the prosecutor turned back to the deputy's interview of Sweet:

Q. Now, sir, let's turn to your interview with Mr. Sweet. What was Mr. Sweet's appearance and demeanor at the beginning of the interview, sir?

A. I had been informed that the deputies thought that he was—had been drinking. I was pleasantly surprised when I got in the interview room—because I'd never met him before—that he was very articulate; that his speech was very easily understood; that he reacted certainly appropriately to my questioning.

Q. Uh-huh. As the interview wore on, did his appearance or demeanor change in any fashion?

A. No.

Q. All right. **Was there anything unusual about the position he took in this case during the interview?**

A. Yes.

Q. What was that, sir?

A. Well, **I felt throughout the interview with Mr. Sweet that he was trying to deflect me.** He would bring up—

[Defense counsel]: Your Honor, I'm going to object to all of these impressions. Everybody in the courtroom heard the interview.

THE COURT: Sustained.

Q. (By [prosecutor]): Did he appear to maintain his faculties through the entire interview?

[Defense counsel]: I'll object to the same question.

THE COURT: Sustained.

Q. (By [prosecutor]): Did the demeanor change from start to end, sir?

A. No. [Emphasis added.]

[¶ 19] Defense counsel conducted a brief cross-examination of the deputy. The prosecutor announced that the State's case was concluded. Defense counsel called no witnesses and rested the defense case.

[¶ 20] During the prosecutor's closing argument, he recounted SM's testimony about the alleged incident, and he said:

> And remember Duane Peyrot when he was talking with Mr. Sweet. He found it very interesting, in fact, very surprising, that this young lady, at 12 years of age, with little, if any, knowledge of sex—of adult sex, would be able to describe this man's penis as small, soft and wrinkly. Think about that very carefully, please, ladies and gentlemen.

Following further argument, the prosecutor played the deputy's interview with Sweet in its entirety. In this regard, he commented:

> Ladies and gentlemen, I played the entire interview out of fairness to the defendant. It may have been overly lengthy. If so, I apologize for that. But, again, I felt if we were going to hear his statement to Deputy Peyrot, we should hear all of it.

After further argument, the prosecutor concluded, saying:

> **So when Deputy Peyrot says** on the tape **he finds it very interesting** [SM] was able to describe his penis that morning, **I think you should find that very interesting, too.** [Emphasis added.]

[¶ 21] In defense counsel's closing argument, he emphasized that on the recording Sweet consistently denied the alleged incident happened; that SM's interview statements and trial testimony contained numerous and serious inconsistencies; that there was no physical evidence of the alleged incident, such as bruises on SM's person; and that the recorded interview was a "strange confession" because Sweet consistently denied SM's accusation. Defense counsel remarked that "[a]lmost all of the testimony was from Mr. Peyrot, as he's saying things. He's a very skilled interrogator, very skilled, one of the best we have around here, and did he ever get Mr. Sweet to say that? No."

### Standard of Review

■ [¶ 22] We noted at the beginning of this opinion that, because Sweet's defense counsel did not object on improper vouching grounds to the admission into evidence of the recorded interview between Deputy Peyrot and Sweet, the plain error standard of review applies to this issue. "Plain error exists when: 1) the record is clear about the incident alleged as error; 2) there was a transgression of a clear and unequivocal rule of law; and 3) the party claiming the error was denied a substantial right resulting in material prejudice." *Schreibvogel v. State,* 2010 WY 45, ¶ 19, 228 P.3d 874, 882 (Wyo.2010).

### Analysis

■ [¶ 23] The State agrees that the incidents alleged by Sweet to be error are clear on the record as is evident from the above and foregoing references. The parties part company, however, on the second requirement of the plain error standard. Sweet maintains that a clear and unequivocal rule of law was violated in a clear and obvious way. In his appellate brief, he states:

> This Court has a long-standing rule that an expert may not vouch for the truthfulness or credibility of a victim, or any other witnesses. *Dean v. State,* 2008 WY 124, ¶ 15, 194 P.3d 299, 304 (Wyo.2008), *citing, Seward v. State,* 2003 WY 116, ¶ 19, 76 P.3d 805, 814 (Wyo.2003). Otherwise, evidentiary issues are committed to the sound discretion of the trial court and this Court will not reverse unless it finds a clear abuse of discretion. *Solis v. State,* [9]81 P.2d 34, 36 (Wyo.1999).
>
> Further, it is improper for one witness to comment that another witness is lying. "The admonition against asking the appellant whether other witnesses lied applies equally to asking any witness whether another witness has lied. *State v. Manning,* 270 Kan. 674, 19 P.3d 84, 100–01 (2001). That is because such questions invade the province of the jury to determine witness credibility. *Id."* *Profitt* [*Proffit*] *v. State,* 2008 WY 114, ¶ 16, 193 P.3d 228, 236 (Wyo. 2008). . . .

\* \* \* \*

This Court has examined vouching-type testimony, evidence and argument in a number of contexts. *See Conine v. State,* 2008 WY 146, ¶ 17, 197 P.3d 156, 162 (Wyo. 2008) (prosecutor's remark in opening statement that witness was a pretty honest man was error, but not prejudicial); *Drury v. State,* 2008 WY 130, ¶ 10, 194 P.3d [1017] 1020, 1021 (Wyo.2008) (police officer testified as lay witness, and tried to interject opinions as to credibility of those interviewed; harmless error found); *Guy v. State,* 2008 WY 56, ¶¶ 20–22, 184 P.3d 687, 694 (Wyo.2008) (prosecutor's statements that he stood behind law enforcement constituted improper vouching, but no prejudice found); and numerous other cases.

[¶ 24] In addition to the authority cited by Sweet, we are mindful of this Court's additional authority, from earlier to more recent times. *See Smith v. State,* 564 P.2d 1194, 1198–99, 1200 (Wyo.1977) (not error for trial court to reject psychologist's testimony concerning defendant's propensity to tell the truth as such testimony invades the province of the jury; expert witness, cloaked in garb of expertise, cannot testify as to the truthfulness of the defendant's version in that it assumes the function of the jury); *Zabel v. State,* 765 P.2d 357, 360, 362 (Wyo.1988) (well established in Wyoming that an expert witness cannot vouch for the truthfulness or credibility of an alleged victim; "a clear and unequivocal rule of law exists concerning this type of testimony: [t]he credibility of witnesses is the exclusive province of the jury and may not be the subject of expert testimony"); *Stephens v. State,* 774 P.2d 60, 67–68 (Wyo.1989), *overruled on other grounds by Large v. State,* 2008 WY 22, 177 P.3d 807 (Wyo.2008) (error to permit a witness, lay or expert, to articulate an opinion as to accused's guilt and error to permit expert to vouch for the truth of the victim who did testify; such testimony encourages jury to abdicate its responsibility); *Bennett v. State,* 794 P.2d 879, 881–82 (Wyo.1990) (error for investigating officer to state opinion that defendant was drug dealer and guilty because it invades jury's function); *Whiteplume v. State,* 841 P.2d 1332, 1337–1341 (Wyo.1992) (investigating deputy sheriff's direct examination testimony that he listened to alleged

victim and determined she had been raped was inferential vouching for truth of alleged victim's testimony which invaded jury's function); *Wilde v. State*, 2003 WY 93, ¶¶ 15–19, 74 P.3d 699, 708–09 (Wyo.2003) (error to admit evidence vouching for alleged victim's credibility as it invades jury's function to assess credibility issues); *Seward v. State*, 2003 WY 116, ¶¶ 18–29, 76 P.3d 805, 812–18 (Wyo.2003) ("forensic interviewer" and investigating detective both improperly vouched for credibility of alleged victim who also testified at trial); *Lopez v. State*, 2004 WY 103, ¶¶ 9–25, 98 P.3d 143, 146–51 (Wyo.2004) (same "forensic interviewer" in *Seward* and *Wilde* improperly vouched for credibility of alleged victim who also testified at trial); *Talley v. State*, 2007 WY 37, ¶¶ 10–12, 153 P.3d 256, 260–61 (Wyo.2007) (State concedes violation of clear and unequivocal rule of law that prohibits "were-they-lying" questions in examination of witness); and *Schreibvogel*, ¶¶ 41–43, 228 P.3d at 888 (State concedes violation of clear and unequivocal rules of law that prohibit a witness's comment on the truthfulness or veracity of another witness and prohibit "were-they-lying" questions in examination of witness as violation invades province of jury).

[¶ 25] Although the State concedes our abundant authority prohibiting vouching, it maintains that no decision from this Court addresses "the ultimate question of whether the introduction of a police interview, in which officers employed such accepted interviewing techniques as expressing disbelief of an interviewee's story, actually and unequivocally constitutes vouching." Moreover, the State canvasses ten decisions from eight other jurisdictions to demonstrate that "various conclusions have been drawn by courts as to whether police statements made in an interrogation or interview should be considered vouching or commenting upon an individual's guilt when referenced at trial." [3]

**3.** "In *Lanham v. Commonwealth*, 171 S.W.3d 14 (Ky.2005), the Kentucky Supreme Court analyzed whether the vouching rules applied to 'nontestimonial statements made by a police officer during an interrogation of a criminal suspect as part of the overall interrogation technique.' *Id.* at 23. In that case, the interrogation included statements by the officer that he believed the appellant was lying. *Id.* at 19. The court began by reviewing the rules established by other jurisdictions, but eventually recognized the difficulty in conjuring from them anything that could confidently be declared a majority rule. *Id.* at 23–26 (citing *State v. O'Brien*, 857 S.W.2d 212, 221 (Mo.1993) (holding 'the testimony was not error because the officer "was not telling the jury that, in his opinion, the defendant is a liar. Rather, the witness was describing the give-and-take of his interrogation of [the defendant]." '); *Commonwealth v. Kitchen*, 730 A.2d 513, 521 (Pa.Super.Ct.1999) (holding that statements made in an interrogation accusing a defendant of lying were inadmissible 'because they were "akin to a prosecutor offering his or her opinion of the truth or falsity of the evidence presented by a criminal defendant ... [or] a prosecutor's personal opinion, either in argument or via witnesses from the stand, as to the guilt or innocence of a criminal defendant...." '); *State v. Demery*, 144 Wash.2d 753, 30 P.3d 1278, 1282–83 (2001) (plurality holding that 'officers' comments on the tape "were not offered during live testimony at the trial" and were "part of a commonly used police interview technique, designed to see whether a defendant will change her story during the course of an interrogation." ' The plurality also stated that the statements were necessary to show the context of defendant's responses.);

*Dubria v. Smith*, 224 F.3d 995, 1001–02 (9th Cir.2000), *cert. denied*, 531 U.S. 1148, 121 S.Ct. 1089, 148 L.Ed.2d 963 (2001) (holding that ' "[t]he questions and comments by [the officer] placed [the defendant's] answers in context, much like a prosecutor's questions at trial." The court also noted that because the comments arose in the context of a pre-trial interview, "[t]hey were not the type of statements that carry any special aura of reliability [with the jury]." '); *State v. Cordova*, 137 Idaho 635, 51 P.3d 449, 453–55 (Idaho Ct.App.2002) (holding that statements during interview that appellant was lying were admissible 'because they provided context for the defendant's answers.'); *State v. Elnicki*, 279 Kan. 47, 105 P.3d 1222, 1227–29 (2005) (holding that there is no difference between statements made on the witness stand pertaining to one's credibility, and ones presented in a videotape.)). *See also State v. Boggs*, 218 Ariz. 325, 185 P.3d 111, 121 (2008) (holding that '[b]ecause [the officer's] accusations were part of an interrogation technique and were not made for the purpose of giving opinion testimony at trial, we find no fundamental error.').

"The Kentucky Supreme Court further recognized that, while there is not a clear majority rule,

[a]lmost all of the courts that have considered the issue recognize that this form of questioning is a legitimate, effective interrogation tool. And because such comments are such an integral part of the interrogation, several courts have noted that they provide a necessary context for the defendant's responses. We agree that such recorded statements by the police during an interroga-

[¶ 26] Both Sweet and the State recognize that in *Pendleton v. State*, 2008 WY 36, 180 P.3d 212 (Wyo.2008), we considered a factual situation somewhat similar to the instant situation. In that case, Pendleton, who did not object at trial to, but advocated for the admissibility of, a three-hour recorded police interview which was played to the jury, claimed on appeal that in a short excerpt from that recorded interview the officers expressed opinions of guilt and implicitly vouched for the credibility of the State's witnesses when they accused Pendleton of lying. *Id.*, ¶ 10, 180 P.3d at 216. Instead of addressing the first two requirements of the plain error standard—the incident is clear on the record and the violation of a clear and unequivocal rule of law—this Court only analyzed whether prejudice resulted when the jury heard the short excerpt about which Pendleton complained. *Id.*, ¶ 11, 180 P.3d at 216. We found no prejudice because Pendleton had advocated for the admissibility of the recording; Pendleton's opening statement and closing argument repeatedly referred to the short excerpt in question and emphasized to the jury to listen to the entire recording as a whole; it was apparent that Pendleton intended to use the recorded interview as a means of presenting her version of the events without testifying in open court; the recorded interview appeared to have been an integral part of Pendleton's trial strategy; and the jury instruction that it was for the

jury to determine the credibility of all witnesses and the evidence mitigated any adverse effect that the alleged improper statements might have had on the jury. *Id.*, ¶¶ 13–19, 180 P.3d at 217–18.

[¶ 27] Sweet distinguishes *Pendleton* from his situation by noting that he, unlike Pendleton, did not advocate for the admissibility of the recorded interview; rather, he unsuccessfully moved to suppress the interview, albeit on involuntariness grounds. For its part, the State argues that in *Pendleton* we made no finding and did not discuss whether the short excerpt in question actually constituted the giving of vouching testimony. We disagree. Implicit in our review were our determinations that the record clearly showed the incident and a clear and unequivocal rule of law had been violated. Had that not been implicit, we would not have gone directly to the prejudice requirement.

[¶ 28] We have carefully considered the contending arguments and must hold that Deputy Peyrot's numerous statements in both the recorded interview and his trial testimony, as identified by Sweet in his argument and as identified in our recounting of his trial testimony, violated in a clear and obvious way this Court's long-standing rules prohibiting a witness to express opinions about the accused's mendacity and guilt and

tion are a legitimate, even ordinary, interrogation technique, especially when a suspect's story shifts and changes. We also agree that retaining such comments in the version of the interrogation recording played for the jury is necessary to provide a context for the answers given by the suspect.
*Lanham*, 171 S.W.3d at 27.
"In *Lanham* and the cases cited therein, the courts' somewhat divergent rules were concerned with statements made by officers during interrogation which indicated a belief that the defendant was lying. The rules are just as divergent when it comes to officers making statements during interviews which indicate they believe the victim. In *Clark v. Commonwealth*, No.2006–SC–000379–MR, 2008 WL 4692347 (Ky. Oct.23, 2008), the Supreme Court of Kentucky decided to not extend the rule of law from *Lanham* to situations where an officer states to a suspect during an interview that he believes the victim. The court held that the rule from *Lanham* was limited to accusations by an officer that the defendant is not being truthful. Unwilling to ex-

tend the rule, the court concluded that the recorded interview with the statements regarding the victim telling the truth amounted to vouching for the victim's credibility. *Id.* at *5.
"However, the Idaho Court of Appeals extended its rule from *Cordova*, and allowed statements regarding the credibility of a child victim's accusations. In *State v. Flegel*, No. 32956, 2007 WL 4247653 (Idaho Ct.App. Dec.5, 2007), the jury heard a recorded interview that included statements by a detective expressing her opinion regarding the truth of the victim's accusations. *Id.* at *5. The court, in reviewing its holding in *Cordova*, stated that a 'suspect's answers to police questioning are only admissible to the extent that they are relevant. Thus, an interrogator's comments that he or she believes the suspect is lying are only admissible to the extent that they provide context to a relevant answer by the suspect.' *Id.* Based upon this rule of the law, the court held that the detective's statements regarding the victim's credibility were necessary to provide context for the appellant's responses and, therefore, admissible. *Id.* at *6."

about the alleged victim's truthfulness and credibility; such statements invade the exclusive province of the jury to determine the credibility of the witnesses and the evidence.

[¶ 29] With regard to prejudice, the third requirement of the plain error standard, Sweet emphasizes that the prosecution rested entirely upon the hotly contested credibility of SM, as there was no physical evidence that the alleged abuse had occurred. He points out that his cross-examination revealed numerous inconsistencies in her testimony and interview statements. He argues there was an implication that SM's motive in her accusation was to leave her mother's household and live with her father. He notes that the recorded interview was played to the jury twice, during the prosecution's direct examination of Deputy Peyrot and again in the prosecution's closing argument. He argues that because the prosecution's case rested entirely on the inconsistent and suspect word of SM, the overwhelming amount of improper vouching ensured that prejudice existed.

[¶ 30] In response, the State argues that Sweet has failed to show he was prejudiced by the recorded interview. The State notes that Sweet relied heavily upon the recorded interview in his closing argument, pointing out that he never admitted to any wrongdoing and that he stated at least twenty-five times that he did not do what SM accused him of. The State also reminds us that the jury was instructed about its exclusive role in determining witness credibility and that we presume the jury follows this instruction. According to the State, it is likely the jury understood that Deputy Peyrot's statements during the recorded interview were part of an interrogation technique. We think that unlikely since there is no evidence that the deputy explained that in his trial testimony. In its brief, the State claimed that nothing in Deputy Peyrot's trial testimony came remotely close to resembling vouching for SM; however, we commend the State for correcting that claim in oral argument. In that particular instance, one finds in the deputy's testimony on direct examination this statement:

I've had just a lot of success talking with kids over my career. I think that's both related to the training, the fact that I'm a dad, the fact I'm pretty empathetic. [SM] and I talked for that 40 minutes. I felt like she was comfortable talking to me. I felt like she was truthful talking to me. I felt like she was—the things she was saying to me, relating to me as facts, fit the situation as I observed them, you know; as you can compare facts being stated to you to the environment and to the feeling you're getting as you're talking to the person.

Finally, the State points to the prosecutor's closing argument in which he reminded the jury that it was for the jury alone to decide what the evidence was and the weight to be given each person's testimony and the evidence.

[¶ 31] Under plain error analysis, to establish material prejudice an appellant must show a reasonable possibility that he would have received a more favorable verdict in the absence of the error. *Zabel*, 765 P.2d at 362. Our examination takes into account the entire record. *Pendleton*, ¶ 11, 180 P.3d at 216; *Talley*, ¶ 14, 153 P.3d at 261. When the error concerns the admission of improper evidence, among the considerations are:

> (1) whether the evidence furnished important corroboration of other testimony; (2) whether it related to a material, consequential fact; (3) whether counsel relied on the evidence in argument; (4) whether the evidence was cumulative; and (5) the effect of any instructions given to the jury. 1 Weinstein's Evidence, ¶ 103[06] (1986).

*Zabel*, 765 P.2d at 362. We have recognized that "perhaps the single most significant factor in weighing whether an error was harmful is the strength of the case against the defendant." *Id.* (quoting 3B Charles A. Wright, Nancy J. King, Susan R. Klein & Peter J. Henning, *Federal Practice and Procedure* § 854 at 305 (2d ed.1982)).

[¶ 32] In this case the State's evidence of Sweet's guilt was not overwhelming; the State provided no physical evidence as there was none; it relied solely on testimonial evidence. A close factual dispute existed between SM's testimony and Sweet's state-

ments contained in the recorded interview. In the State's opening statement to the jury, it told the jury that the recorded interview was "significant evidence" on which it needed to concentrate and that it would hear on the recording that Sweet believed SM was truthful. In the State's case-in-chief, the prosecution presented Deputy Peyrot as an expert "forensic interviewer" and the deputy testified that, during his interview of SM, he asked her if she knew the difference between the truth and a lie. Under the prosecutor's questioning, the deputy testified as to his opinion of SM's mannerisms and demeanor during her interview with him and her testimony at trial; he testified "I felt like she was truthful talking to me." The prosecutor played the recorded interview between the deputy and Sweet during the deputy's trial testimony and again during the prosecution's closing argument.

[¶ 33] During the prosecutor's closing argument, he asked the jury to remember that Deputy Peyrot found it "very interesting, very surprising" in his interview with Sweet that SM would be able to describe Sweet's penis; the prosecutor asked the jury to think about that very carefully and told the jury "I think you should find that very interesting, too." Our impression is that the prosecutor relied on the deputy's interview statements and trial testimony to paint Sweet in an unfavorable light and his accuser in a favorable light.

[¶ 34] While Sweet relied on the recorded interview to show his repeated denials of the deputy's accusations, he had little choice since the court had denied his suppression motion. In that respect, this case is distinguishable from *Pendleton* in which the defendant advocated for the admissibility of the recorded interview.

[¶ 35] Although the jury instructions correctly informed the jury of its role in determining credibility, we are concerned that no cautionary instructions were given to the effect that the deputy's statements were not to be considered as evidence.

[¶ 36] Credibility was the pervasive issue for the jury in this trial. In our view, a reasonable possibility exists that in the absence of the deputy's statements in the re-

corded interview and in his trial testimony which commented on the alleged victim's truthfulness and the accused's mendacity and guilt the verdict might have been more favorable to Sweet. Consequently, we reverse and remand for a new trial in which these errors will not be repeated.

***Issue Two: Whether Jury Instruction No. 11 was improper.***

***Background Facts***

[¶ 37] The trial court gave Jury Instruction No. 11 which read "Corroboration of an alleged victim's testimony is not necessary to obtain a conviction for sexual assault." The record is not clear who proposed this instruction.

***Standard of Review***

[¶ 38] As noted previously, the applicable standard of review is plain error.

***Analysis***

[¶ 39] Sweet claims error because he was charged with "sexual abuse," not "sexual assault" as this instruction reads. While he and the State argue back and forth about the evolution of the Wyoming statutes covering the various sexual assault and sexual abuse provisions, we find it unnecessary to sort that out because, as we recently observed in *Garza v. State,* 2010 WY 64, ¶ 21, 231 P.3d 884, 891 (Wyo.2010), we disapproved of a similar jury instruction in *Story v. State,* 721 P.2d 1020, 1044–46 (Wyo.1986). On retrial of this case, the trial court shall not give this jury instruction.

***Issue Three: Whether cumulative error occurred because of alleged improper victim impact testimony, alleged judicial and prosecutorial bias in favor of the alleged victim, admission of alleged irrelevant evidence, and the prosecutor's multiple references to sexual assault.***

***Standard of Review and Cumulative Error***

<span style="background:black">▮</span> [¶ 40] As previously stated, the applicable standard of review is plain error. With respect to assignments of cumulative error, we have said:

The purpose of evaluating for cumulative error is to address whether the cumulative effect of two or more individually harmless errors has the potential to prejudice the defendant to the same extent as a single reversible error.

*Guy v. State,* 2008 WY 56, ¶ 45, 184 P.3d 687, 701 (Wyo.2008) (quotation marks omitted). When making this evaluation, we consider only matters that were determined to be errors, and not any matter assigned as error but determined not to be erroneous. *Id.;* *Eaton v. State,* 2008 WY 97, ¶ 105, 192 P.3d 36, 79 (Wyo.2008).

### *Analysis*

#### 1. *Improper Victim Impact Testimony*

[¶ 41] Sweet claims the prosecutor asked SM and her mother questions designed to produce inappropriate victim impact responses and claims the prosecutor argued victim impact information in his closing argument. All of the instances Sweet cites in his brief are clear from the record, satisfying the first part of the plain error standard of review. However, he has failed to demonstrate a violation of a clear and unequivocal rule of law. We have said:

> Broadly speaking, victim impact evidence is that evidence relating to the victim's personal characteristics and to the physical, emotional, or social impact of a crime on its victim and the victim's family.

*Smith v. State,* 2005 WY 113, ¶ 15, 119 P.3d 411, 416 (Wyo.2005). For victim impact testimony to be admissible, it must be relevant:

> The evidence must be relevant to be admissible. W.R.E. 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." W.R.E. 401. In criminal cases, "[e]vidence is always relevant if it tends to prove or disprove one of the elements of the crime charged." *Gomez v. State,* 2003 WY 58, ¶ 6, 68 P.3d 1177, ¶ 6 (Wyo. 2003) (quoting *Geiger v. State,* 859 P.2d 665, 667 (Wyo.1993)). Relevant evidence may be excluded, however, if "its probative value is substantially outweighed by the danger of unfair prejudice." W.R.E. 403.

*Moore v. State,* 2003 WY 153, ¶ 26, 80 P.3d 191, ¶ 26 (Wyo.2003). The testimony of victims of a crime describing how it affected their lives after the crime is irrelevant with respect to issues before a jury. *Moore,* ¶ 27 (citing *Justice v. State,* 775 P.2d 1002, 1010–11 (Wyo.1989)).

*Jensen v. State,* 2005 WY 85, ¶ 16, 116 P.3d 1088, 1094 (Wyo.2005).

[¶ 42] The specific excerpts pointed out by Sweet do not fit our definition of victim impact testimony and, even if they did, the testimony was otherwise relevant. Sweet claims the following portion of SM's testimony was error:

> [Prosecutor]: [SM], how did you feel while this was going on?
>
> [SM]: Scared.
>
> Q: Were you crying?
>
> A. Yes.

When we consider the context of that testimony, it is seen that the prosecutor was having the victim testify as to the totality of the circumstances at the time the alleged incident occurred and immediately thereafter. Just before those questions were asked, SM had testified about telling her mother about the incident. It was clear by this point that Sweet's defense was to discredit SM with seemingly inconsistent statements made before her trial testimony. Thus, this information was relevant to bolster SM's credibility by showing that at a relevant time she exhibited a demeanor consistent with having experienced a traumatic event, and to give the jury a reason as to why her previous statements and trial testimony may have appeared inconsistent. *See White v. State,* 2003 WY 163, ¶ 20, 80 P.3d 642, 651 (Wyo. 2003).

[¶ 43] Sweet also claims the testimony of CB, SM's mother, contained victim impact testimony:

> [Prosecutor]: What was your state of mind at that time, ma'am? Were you upset?
>
> [CB]: Very.
>
> Q. Describe to us a little bit about what you were feeling at the moment?

A. Heart broke. Just so angry that I could—I punched a wall.

Q. Did you hurt yourself?

A. Yeah.

This testimony was elicited as the prosecutor was having the mother testify to the events occurring immediately after her daughter informed her about the incident. It was relevant as it provided the context of and the likely reason for Sweet's flight from the home, which lead to the subsequent police action. As this testimony was relevant, it clearly did not qualify as victim impact testimony. As noted above, victim impact testimony is "evidence relating to the victim's personal characteristics and to the physical, emotional, or social impact of a crime on its victim and the victim's family." *Smith*, ¶ 15, 119 P.3d at 416. This testimony described the circumstances at the time of and shortly after the incident, not how the incident has further impacted SM or her mother.

[¶ 44] Finally, the prosecutor's closing argument did not reference any victim impact testimony. Sweet has cited one paragraph of a closing statement that consumed ten and a half pages of transcript and, when we consider that argument in its entirety, it is clear that—in the single challenged paragraph— the prosecutor was trying to help the jury understand SM's demeanor while testifying and why she previously may have made statements inconsistent with her trial testimony:

> I'd like to talk with you a little bit about [SM] in this sense. You got to see her on the witness stand yesterday. You got to see her demeanor, her mannerisms as she talked with you. And I think what you saw was a very shy 13–year–old girl in the early stages yet of puberty, perhaps reluctant, wouldn't you think, to be talking about things like this in a great big courtroom with a microphone in front of her, in front of people whom she's never before met in her life, about things of an embarrassing nature.
>
> And, please, no one answer these questions, but let's consider this. What if someone came up to you and said, I would like you, in front of a great big group of strangers, to tell us in intimate detail about the best possible sexual experience you've ever had in your life. How would you feel about that? How would you feel about that?
>
> Let's flip the question over. What if someone came up to you and said, I want you to tell me in great detail about the worst sexual experience you've ever had in your life. How would you like to deal with that question? And how would you handle it? How would a 13—girl now 13 years old handle it? Well, we saw.
>
> Now let's talk a little bit about inconsistencies. I don't know how you viewed [defense counsel's] cross-examination of [SM] yesterday. My thoughts aren't important. Yours are. But [defense counsel] attempted to develop some areas of inconsistency.
>
> Was she wearing a bra? Was she not? Did [Sweet] have black sweat pants on, or was he wearing black jeans? These kinds of things.
>
> Did she come out of her mother's room on her own, or did he invite her out?
>
> Was Scooby Doo on, or was it not?
>
> Did you notice something? He stayed away from the sexual assault entirely. He never went there. He never went there.
>
> Now, think about the events of that day occurring November 29, 2007, a little over six months ago now if my elementary math is correct, and think about your own common experience and common sense you had of human affairs, and think whether or not a person's memory of detailed events gets better with time or worse with time.
>
> And considering her credibility, why don't you consider this? What if every single thing she had told you yesterday dovetailed 110 percent with what she told Deputy Peyrot? Wouldn't that give you reason to be more suspicious of her testimony? Wouldn't you think she had been rehearsed to the very last ultimate detail, if that had occurred?
>
> It did not occur. The reason why, it was because she was testifying based on her best present memory of the events that occurred.

When the challenged statement in the third paragraph quoted above is put into context of the closing argument as a whole, we see that the prosecutor was not trying to discuss the impact the crime had on SM. Instead, he was asking the jury to consider such circumstances as the passage of time and the stresses of testifying when it considered the credibility of SM's testimony, particularly in conjunction with statements she had previously made. Consequently, Sweet has failed to show any error regarding victim impact testimony or argument that could be considered in a cumulative error analysis.

**2. Whether the prosecutor and district court exhibited bias toward SM.**

█ [¶ 45] Sweet claims that the district court and the prosecutor exhibited bias towards SM at trial, as they used terms of endearment such as "My Dear" and "Hon" when speaking to her. While it is clear from the record the prosecutor and district court did use these terms and phrases, Sweet has failed to show a violation of a clear and unequivocal rule of law.

█ We have previously defined bias, specifically in the judicial context:

Bias is a leaning of the mind or an inclination toward one person over another. The "bias" which is a ground for disqualification of a judge must be personal, and it must be such a condition of the mind which sways judgment and renders the judge unable to exercise his functions impartially in a given case or which is inconsistent with a state of mind fully open to the conviction which evidence might produce.

*Pearson v. State*, 866 P.2d 1297, 1300 (Wyo. 1994) (citing *Hopkinson v. State*, 679 P.2d 1008, 1031 (Wyo.1984)). Our review of the record does not reveal any exhibition of bias or favoritism towards SM on the part of the district court when it called SM "My Dear" one time; nor does the prosecutor's calling her "Hon" on four occasions manifest any undue bias in that direction. Instead, the record simply shows with respect to the latter that the prosecutor, at four random points during his direct and cross-examination, used a term of address commonly employed when referring to others, particularly

children. This does not demonstrate bias towards a victim or, more importantly, against Sweet. Nor would the jury likely interpret that usage as manifesting bias. When the district court referred to SM as "My Dear," SM was under aggressive cross-examination by defense counsel and she began shying away from the proceedings and speaking in a softer voice:

[Defense counsel]: Okay. Did you testify differently to us at the County Attorney's Office? Do you understand what I mean? Did you ever say something different?

[SM]: Not that I know of I haven't.

Q: Okay. Why don't you turn to page 9. Look at about the fifth line down. One that starts: Yeah, how long had you been sick?

A: Yes.

Q: And then you answered the next line. What did you say?

A: It started that day, and I think I was gone the next day.

THE BAILIFF: The jury cannot hear.

THE COURT: [SM], I need you to pull that microphone and I need you to talk right into it, because none of us can hear you, My Dear. So I need you to do your best. I know you're trying, so pull that microphone down, talk right into it. Thank you.

There is nothing in the record that shows the use of the phrase "My Dear" arose out of any bias or was likely to be understood by the jury as an expression of favoritism on the part of the trial court. The court simply used a common moderately informal term of address, particularly applicable to children, when attempting to get SM to speak into the microphone. We see nothing in that exchange indicating the court's resort to that familiar phrase revealed bias against Sweet. Sweet has failed to demonstrate error that could be considered in a cumulative error analysis.

**3. Admission of alleged irrelevant evidence: Testimony regarding Sweet's actions after the incident and his subsequent arrest.**

█ [¶ 47] Sweet maintains that testimony regarding his actions after he was con-

fronted by SM's mother and his subsequent arrest was irrelevant and, therefore, inadmissible. The testimony is clear from the record but Sweet has failed to demonstrate a violation of a clear and unequivocal rule of law. SM's mother testified that, after she found out about the incident, she confronted Sweet and told him she was going to call the police. She further testified that, at that point in time, Sweet got into his car and left the scene. Deputy Benedict then testified to the facts surrounding Sweet's apprehension, including the suspicion he was hiding inside a residence, and Deputy Benedict's transport of Sweet to the detention center. The jury was also informed that the residence to which Sweet went belonged to a neighbor and Sweet did not have permission to be in the residence.

[¶ 48] As Sweet points out in his brief, we have held that evidence of "flight is admissible as evidence of guilt and is admissible as tending to show consciousness of guilt." *Cureton v. State,* 2003 WY 44, ¶ 11, 65 P.3d 1250, 1253 (Wyo.2003). Sweet suggests, however, his actions in and of themselves could not be properly received as evidence of flight, and that the prosecutor needed to affirmatively show his actions constituted fleeing from the scene of the crime. Sweet's claim is without merit.

[¶ 49] In *Cureton,* the appellant tried to dismiss flight as a reason for his actions as well. We held:

> The State is not required to prove the purpose of appellant's flight. Rather, it is up to the jury to fairly draw reasonable inferences as to the purpose of appellant's actions. Even though it is possible to draw other inferences from the evidence presented, the jury has the responsibility to resolve conflicts in the evidence. This Court will not substitute its judgment for that of the jury. Simply stated, the jury was free to consider appellant's flight as showing consciousness of guilt for the Baldwin burglary.

*Id.* ¶ 12, 65 P.3d at 1253 (internal citations omitted). Because a jury could have reasonably inferred that Sweet's actions constituted fleeing from the scene of the crime, the evidence was relevant to show his conscious-

ness of guilt. Therefore, the evidence was admissible, and Sweet has failed to show an error that can be considered in a cumulative error analysis.

**4. *The Prosecutor referred to Sweet's actions as an "assault" or "sexual assault."***

 [¶ 50] Sweet's last contention is that it was error for the prosecutor to refer to Sweet's actions as a "sexual assault" or an "assault." As in Sweet's argument concerning Jury Instruction No. 11, the basis for this argument is that he was charged with the crime of sexual abuse of a minor and not sexual assault. However, the crime for which he was charged is contained within Article Three of Chapter Two of the Wyoming Criminal Code of 1982, which is entitled "Sexual Assault."

[¶ 51] Moreover, we find that common definitions of the terms "assault" and "sexual assault" show that, although the statutory title of the particular crime for which Sweet was convicted may not include the word "assault," SM was nonetheless subjected to an assault:

> **assault,** *n.* 1. *Criminal & tort law.* The threat or use of force on another that causes that person to have a reasonable apprehension of imminent harmful or offensive contact; the act of putting another person in reasonable fear or apprehension of an immediate battery by means of an act amounting to an attempt or threat to commit a battery.

Black's Law Dictionary 130 (9th ed.2009).

> **sexual assault.** . . . 2. Offensive sexual contact with another person, exclusive of rape.

*Id.* at 131. We hold it was not error for the prosecutor to refer to Sweet's actions as an "assault" or a "sexual assault," as those are proper descriptions of his alleged conduct, although not the specific name of the crime. Therefore, Sweet has failed to show an error that can be considered in a cumulative error analysis.

[¶ 52] In conclusion, we hold that no error occurred with respect to any of Sweet's claims, and none of the trial events he has

challenged carried any potential to prejudice him or otherwise affect the outcome of his trial. Therefore, his cumulative error claim fails.

[¶ 53] Reversed and remanded for a new trial.