STATE

v.

Viroth PHANNAVONG.

No. 2010–256–C.A.

Supreme Court of Rhode Island.

June 17, 2011.

---

**11.** We note that no contempt-proceeding issue is before us, and the cases cited to us are therefore inapposite.

Aaron L. Weisman, Department of Attorney General, for State.

Janice M. Weisfeld, Office of the Public Defender, for defendant.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, and ROBINSON, JJ.

## OPINION

Justice GOLDBERG, for the Court.

This case came before the Supreme Court on May 10, 2011, on appeal by the defendant, Viroth Phannavong (defendant or Phannavong), from a judgment of conviction in the Providence County Superior Court. The defendant was convicted of three counts of child molestation—one first degree and two second degree—against his former girlfriend's daughter, Jane (complainant or Jane).[1] On the first-degree count, Phannavong was sentenced to forty years at the Adult Correctional Institutions, with twenty years to serve, and on the second-degree counts, he was sentenced to ten years to serve, all sentences to run concurrently. On appeal, the defendant contends that the trial justice erred (1) by refusing to admit into evidence a map of the City of Woonsocket, and (2) by denying his motion for a new trial. For the reasons set forth in this opinion, we affirm the judgment of conviction.

1. Because complainant was a minor at all relevant times, we shall use pseudonyms to protect her and her family's privacy.

## Facts and Travel

Jane was eleven years old in 1999 when her mother and defendant began dating. Jane testified at trial that, shortly after she met Phannavong, he moved in with Jane, her three sisters, and her mother, who were living in a multifamily home near Cold Spring Park in Woonsocket. Jane has few memories of her mother being present during those years because "she was out all the time," often for multiple days at a time, pursuing her gambling habit. During those years, defendant was the primary caretaker of Jane and her three sisters. Things soon took a turn for the worse, however, when defendant began to molest Jane.

The first incident Jane testified to at trial occurred at the Cold Spring Park house. The defendant, Jane, and her sisters were playing hide-and-go-seek, and defendant led Jane to the basement to hide. The defendant then took Jane over to a chair where he digitally penetrated her vagina. Phannavong stopped when he heard one of Jane's sisters coming down the stairs into the basement.

Jane testified to two other incidents during which defendant molested her when the family was living in a multifamily home on Park Avenue, also in Woonsocket. The first incident occurred one day when Jane was in the shower. Although she distinctly remembered locking the bathroom door, defendant picked the lock, undressed, and got into the shower with Jane.[2] He began touching her breasts and vagina, and also inserted his finger into her vagina.

The next incident occurred in the attic bedroom Jane shared with her sisters, defendant, and her mother. Jane was sleeping on the floor with her three sisters when defendant picked her up off the floor and carried her to his bed. She testified that she "was half asleep, and then the next thing [she] remember[ed] [was defendant] putting his penis inside of [her]."

The relationship between defendant and Jane's mother lasted for several years. When they parted company, Jane and her sisters moved in with their grandparents. Although when she was thirteen or fourteen years of age Jane told a cousin and one of her sisters about the molestation, it was not until Jane was eighteen years old that she disclosed the abuse to an adult and then, a few days later, to the police. At trial, Jane testified that she did not want to report the abuse because in her family's Laotian culture, it was considered taboo to discuss such matters. However, when she found out that another young girl was living with defendant, she decided to tell the police in the hope that the young girl would not have to experience what Jane endured.

After a jury trial, Phannavong was convicted of one count of first-degree child molestation, for the incident in the attic at the Park Avenue home, and two counts of second-degree child molestation, both stemming from the bathroom incident, also at the Park Avenue home.[3] He appealed to this Court, challenging the trial justice's refusal to admit a map of Woonsocket as a full exhibit and the denial of his motion for a new trial.

## Analysis

### I

### Exclusion of the Map of Woonsocket

■ At trial, defendant sought to introduce a map of Woonsocket, Rhode Island,

---

2. The defendant later showed Jane how he picked the lock to the bathroom. He inserted a wire hanger into the door handle, and was able to push the lock open from the outside.

3. The defendant was found not guilty on the count stemming from the basement incident at the Cold Spring Park home.

which depicted Cold Spring Park as well as defendant's former home, on Winter Street. The map at issue appears to have been printed from the "YELLOWPAG-ES.COM" website; however, the exhibit does not depict the entire City of Woonsocket. Rather, it portrays Cold Spring Park. Further, the location described as defendant's house was marked by hand. Phannavong sought to demonstrate that the home on Winter Street was the only place he had lived that was near Cold Spring Park, and that home had been foreclosed in 1997—two years before the alleged incident that Jane testified to. After the map was marked for identification, the state objected to its admission as a full exhibit, arguing that it could not be authenticated properly. At a conference at sidebar, the trial justice noted that the map was not a self-authenticating document. He stated, "anybody could come in with a document and say, 'Oh, I pulled this up from the [i]nternet.' How do I know [it is] right?" In excluding the exhibit, the trial justice reasoned that defendant had been permitted "to testify as to this diagram. He's told us how far that house was from the park. I think beyond that, unless you [have] something to substantiate the veracity of this document, I don't think he is the person that can testify to it[.]" The trial justice sustained the state's objection and did not allow the map to be admitted as a full exhibit.

■ It is well established that this Court reviews a trial justice's ruling to admit or exclude evidence under an abuse-of-discretion standard. *State v. Marmolejos,* 990 A.2d 848, 851 (R.I.2010). Before this Court, defendant argues that a demonstrative aid such as a map is relevant and admissible because it explains live testimony; and, defendant argues, it is authenticated simply by the witness's testimony that it is a fair and accurate de-

piction of what he or she is attempting to describe. The defendant also cites to *State v. Greene,* 74 R.I. 437, 443–44, 60 A.2d 711, 715 (1948), in which this Court held: "The rule is well established that maps illustrating the scenes of the commission of a crime and the relative location of streets or objects, *if shown to be reasonably accurate,* are admissible in evidence in order to enable the jury properly to understand and apply the evidence to the particular case." (Emphasis added.) However, defendant overlooks key language from *Greene* requiring that the map be "shown to be reasonably accurate." *Id.* at 443, 60 A.2d at 715.

The document at issue in this case lacks even minimal indicia of reliability, such as a notation of the scale to which the map was drawn or a Compass Rose indicating direction. Without being properly authenticated—other than by defendant's opinion that the map is an accurate depiction according to his memory—the map's reliability was not established, and it cannot be said that the trial justice abused his discretion by excluding it.

## II

### Motion for a New Trial

■ "It is well settled that when reviewing a motion for a new trial, the trial justice must determine 'whether the evidence adduced at trial is sufficient for the jury to conclude guilt beyond a reasonable doubt.'" *State v. Peoples,* 996 A.2d 660, 664 (R.I.2010) (quoting *State v. Stone,* 924 A.2d 773, 779 (R.I.2007)). The trial justice acts "as a thirteenth juror, exercising 'independent judgment on the credibility of witnesses and on the weight of the evidence.'" *State v. Heredia,* 10 A.3d 443, 446 (R.I.2010) (quoting *State v. Imbruglia,* 913 A.2d 1022, 1028 (R.I.2007)). "If, after conducting such a review, the trial justice reaches the same conclusion as the jury,

the verdict should be affirmed and the motion for a new trial denied." *Heredia,* 10 A.3d at 446 (citing *State v. Snow,* 670 A.2d 239, 244 (R.I.1996)). As long as "the trial justice has complied with this procedure and articulated adequate reasons for denying the motion, his or her decision will be given great weight and left undisturbed unless the trial justice overlooked or misconceived material evidence or otherwise was clearly wrong." *Peoples,* 996 A.2d at 664 (quoting *State v. Horton,* 871 A.2d 959, 967 (R.I.2005)).

■ The defendant argues on appeal that the trial justice erred in denying his motion for a new trial because the verdict failed to do substantial justice between the parties. Specifically, he argues that Jane's "story was inherently unbelievable—and not a single other witness was presented by the state who could in any way corroborate her claims." The defendant also points to the fact that Jane did not report the abuse until approximately seven years later, despite the fact that she probably was taught to report inappropriate touching in school.

After hearing arguments from both parties, the trial justice conducted a thorough overview of the relevant case law, the testimony presented, and passed on the credibility of the witnesses. He stated:

"All I had to look at, really, were the two principals to this case. Granted, the burden is clearly on the [s]tate throughout the trial, but as I watched [Jane] throughout her testimony, both on direct and cross-examination, where I say that she was clearly forcefully cross-examined, she came across to me as being most credible. These were not fabrications. These were not things that she was making up. * * * This was a case where a very, very intelligent young lady, in my mind, was assaulted. And, as is often the case, revealed * * *

sometime after the incident. And, unlike a lot of cases where there might not be any explanation for the delay, here the cultural background of the case would clearly explain why she was reluctant to come forward earlier. She knew that, to some extent, she would be disowned by her family for doing it. And, she gave direct testimony in that regard."

Addressing the credibility of defendant, the trial justice concluded that portions of his testimony "just didn't ring true." On the other hand, he found that "the complaining witness was, in my mind, a most-credible witness and being satisfied that there was much lacking in what the defendant had to say, I'm of the mind that had I been sitting over there with the jurors, I would have done exactly what they did in reaching the verdict that they did reach."

We are of the opinion that the trial justice clearly conducted a thorough review of the credibility of the witnesses and the weight of the evidence to support the verdict. Because there is nothing in the record before us to suggest that he erred in his ruling on the motion for a new trial, we are confronted with no reason to disturb his findings. We therefore affirm his ruling on the defendant's motion for a new trial.

### Conclusion

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

Justice INDEGLIA did not participate.