**Supreme Court**

No. 2014-78-C.A.

(P1/09-2058A)

State                                    :

v.                                       :

Gary Gaudreau.                           :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Tel. 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State                           :

v.                           :

Gary Gaudreau.                  :

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Flaherty, for the Court.**  The defendant, Gary Gaudreau, appeals from a judgment of conviction entered after a jury found him guilty of first-degree arson in violation of G.L. 1956 § 11-4-2.  The trial justice sentenced the defendant to twenty-five years—with nine years to serve and sixteen years suspended, with probation—for setting fire to his place of business, Physique Gym, during a severe snowstorm in the middle of the night on March 2, 2009.  This case came before the Supreme Court for argument on March 1, 2016.  The defendant raises two issues on appeal: (1) he challenges the admission into evidence of a video recording of his custodial police interrogation; and (2) he challenges the denial of his motion for a new trial on the basis that the verdict was against the weight of the evidence.  After careful consideration of the defendant's arguments and a thorough review of the record, we affirm the judgment of conviction.

- 1 -

**Facts and Travel**

**The Fire and the Early Morning Investigation**

During the early morning hours of March 2, 2009, in blizzard-like weather conditions, the Physique Gym on York Avenue in Pawtucket became engulfed in flames.[1]  At around 3:40 a.m., the Pawtucket Fire Department received a call and responded to the fire.  The first officer to arrive at the scene reported the fire to be "code red, fully involved," meaning that it was "an actual active confirmed fire" and "more progressed than you would normally expect on a certain arrival time."  Battalion Chief Timothy Mercer said that the fire was fought during "[s]ome of the worst conditions [he'd] experienced," with "single[-]digit cold, heavy snow and quite windy."  Mercer described the conflagration as "quite extensive," that "[f]lames were already shooting out the windows, [and a] heavy smoke condition [was] reducing the visibility in the area quite substantially."

At about that same time, at 3:50 a.m., the gym's proprietor, Gary Gaudreau, called the police to report a breaking and entering at his home.  Predictably, Mr. Gaudreau quickly became the primary target of police interest for what was already suspected to be an intentional arson.

Officer David Dolan reported to Gaudreau's home to investigate the reported breaking and entering.  Because of the hazardous conditions, it took him approximately thirty minutes to go the four miles from the police station to Gaudreau's home.  The officer said that he was "paying special attention" because he had been informed on his way to the investigation that Gaudreau's business was ablaze.  Upon arrival, Officer Dolan observed only one set of tire

---

[1] As set forth in detail, <u>infra</u>, there were two jury trials.  The first jury trial was held in November 2012 and ended in a mistrial when the jury could not reach a verdict.  The second trial was presided over by a different trial justice in September 2013.  The facts presented here are derived entirely from testimony and evidence presented at the second trial, unless otherwise specified.

marks on the snow-covered driveway and he did not see any footprints on the sidewalk, in the driveway, or in the front yard. However, when he walked up the driveway toward the detached garage, Officer Dolan did see one set of footprints leading from the garage to the back porch area.

When Officer Dolan reached the back door of the home, he noticed a broken Plexiglas window, with glass on the ground, both outside and inside the door. Gaudreau admitted the officer into the kitchen and living room. At that time, Gaudreau told him that he had left his house at approximately 1:30 a.m. and drove around for a couple of hours because he was unable to sleep. He said that he returned home at approximately 3:40 or 3:50 a.m. and called the police about the break-in. Gaudreau also told the officer that the only thing that was missing from his home was a "fanny pack" that had been on an ottoman in the living room. He said that the fanny pack contained his keys to the gym, his wallet, and an unloaded handgun. Dolan did not investigate the rest of the house, relying on Gaudreau's statement that he had searched the house and had found no one present and no other broken windows. Gaudreau also showed the officer an alarm-type system in his living room, explaining that "[w]hen it registers a noise, such as glass break [sic], there is a delay and then an alarm sounds." Gaudreau explained that he believed that whoever had broken in came through the rear window, became spooked by the alarm, and grabbed the fanny pack before leaving through the same window.

At Officer Dolan's request, Gaudreau showed him the garage, where the officer inspected the interior and exterior of the car, finding nothing of interest except that, when he touched the hood of the car, it felt cold. Officer Dolan explained that Gaudreau was helpful, cooperative, and even talkative throughout his investigation, but that he appeared to be "walking very slowly and deliberately," or "gingerly." Officer Dolan said that he was at Gaudreau's house for about ten

minutes, but Gaudreau did not mention that he was aware that his business was on fire until the end of the investigation. At that time, Gaudreau told the officer that he was going to drive over to the scene of the fire at his gym.

Meanwhile, the battle to fight the blaze continued; the fire had progressed to a "third alarm," meaning that the battalion chief had twice called for additional apparatus and manpower from within Pawtucket, as well as "mutual aid" from other communities. David Curran, a fire investigator with the State Fire Marshal's office, arrived and photographed the scene in those early morning hours.

Detective Scott Feeley of the Pawtucket Police Department, the lead detective on the case, spoke to firefighters at the scene and contacted the property owner, George Gardinar. Mr. Gardinar informed Det. Feeley that he leased the property to Gaudreau for use as a gym and that he had allowed his insurance policy on the building to lapse a few years earlier. Detective Feeley then contacted Gaudreau and asked to speak with him at the police station about the fire and the breaking and entering. Around 7 a.m., he and Det. Robert Matook informed Gaudreau of his Miranda rights and informed him that, although he was a suspect, the interview was voluntary; the interview was not recorded.[2] Gaudreau told the detectives that he left the gym the night before at approximately 9:30 p.m., stopped at a bank on his way home, and made a deposit. He said that he was at home for a few hours and then he went for a drive at about 1:30 a.m. because he could not sleep. He said that he drove into and around Seekonk, Massachusetts, before returning home around 4 a.m. Detective Feeley said that Gaudreau told him that someone had broken into his house while he was out driving and that whoever broke into his home had taken his fanny pack containing his gym keys, his wallet, a firearm, and cash. After the

---

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

interview, Det. Feeley searched Gaudreau's car, house and garage, but nothing was seized, and Gaudreau returned home.

However, when Det. Feeley returned to the station, he was notified that a witness had contacted law enforcement at the scene of the fire. Paul Richard, a snowplow driver, met Det. Feeley at the police station and told him that he had seen Gaudreau at the Physique Gym earlier that night when he was plowing snow. He gave the detectives a signed statement explaining that he was called into work at about 9 or 10 p.m. that night to plow in the area of the gym. He said that he saw Gaudreau, with his car backed up to an open door at Physique Gym with the trunk open, at approximately 1:45 a.m. Mr. Richard explained that he was familiar with Gaudreau and with his car because he was a member of Physique Gym. About 15 minutes later, Mr. Richard recalled seeing Gaudreau in his car at the intersection of Newport and Columbus Avenues; indeed, he recalled flashing his lights for Gaudreau to go through the intersection. Mr. Richard also identified Gaudreau from a photo array.

### The Interrogation

Not surprisingly, after he was identified by Mr. Richard, Gaudreau was asked to return to the police station around noon. Gaudreau voluntarily returned, again waived his Miranda rights, and was interviewed again. The second interview was videotaped. At trial, the video interrogation was played for the jury during Det. Feeley's testimony. The interrogation began with the detectives asking Gaudreau to once again explain his whereabouts during the preceding night and early morning. After Gaudreau essentially repeated the same story that he related to Officer Dolan and during his 7 a.m. interview at the police station, the detectives asked him directly, "You had nothing to do with starting this fire?" Gaudreau responded, "Nothing to do with starting this fire."

Detective Feeley then said, "Well, now that we have that taped, I want to read the statement we have –." He then read from Mr. Richard's sworn statement explaining that he had seen Gaudreau at the gym around 1:45 a.m. Detective Feeley said he "showed him eleven pictures and guess who he picked out as the guy who was coming out the door at 1:45 a.m.?" Gaudreau responded, "Not me." Gaudreau also denied the detectives' accusations that "the jig is up," that it was Gaudreau who set the building on fire, that there was a witness who knew him, and that Gaudreau was lying. The detectives repeatedly told Gaudreau that he was lying, that he made false statements to the police, that he made up the "cockamamie" story about his house being broken into, and that they were sure they would find his fanny pack at the gym.

Gaudreau steadfastly refused to change his story, saying, "The guy might have seen me earlier, but he didn't see me anywhere near that time." When he continued to deny any involvement in setting the fire, Det. Feeley finally said, "You're being charged with second degree arson. This is your last chance to be remorseful and give us a reason." But after they failed to wrest a confession out of Gaudreau, the detectives left the room.

Curran, the fire inspector, who was also at the Pawtucket police station to meet with detectives and Gaudreau, advised the police that, because the building had been occupied within the past six months, the appropriate charge would be first-degree arson. When the detectives returned to the interrogation room a few minutes later, they informed Gaudreau that he would be charged with first-degree arson, a capital offense. Detective Feeley said, "So, is there anything you want to say? Because this is the last time we're ending the interview. We're going to bring you downstairs." Gaudreau said, "No," and was placed under arrest.

**The Post-Arrest Investigation**

After Gaudreau was arrested, the detectives brought him to the cellblock to process him and to seize his clothing, so that they could be tested for accelerants. When Gaudreau's clothes were removed, the detectives observed large sores on his lower legs and slight injuries on his hands. When asked what had happened to his legs, Gaudreau replied that it was a rash. Gaudreau was brought to the hospital to be treated for his obvious injuries; Det. Feeley was informed by medical personnel that the sores were second-degree burns.

Detective Feeley then obtained warrants to search Gaudreau's home for a second time, the garage, and the gym. In addition, the detective sought assistance from Sgt. Michael Peters of the Massachusetts State Police, a certified accelerant detection canine handler, who was brought in the next day. Sergeant Peters worked with a dog trained to search a fire scene and alert to the presence of petroleum products, or "flammable liquids that are carbon-based, gasolines, kerosenes, diesel fuels."

There were no alerts from Gaudreau's car, residence, or the clothing that had been confiscated at the time of his arrest. However, the dog did alert to four areas at the scene of the fire. Upon excavating, or de-layering, two of the areas, burned paper towels and the melted remains of what appeared to be a thirty-gallon Rubbermaid-type barrel were discovered. Also, a strong odor consistent with gasoline, one cap from a gas can, and rubber mats covering the floor were found. The other two areas also were de-layered and washed down, and irregular and "very significant burn pattern[s]" were discovered, consistent with "flammable liquid being poured out of a container and then ignited."

At each of the four alert sites, fire inspector Curran collected samples in certified evidence cans to send to the state crime lab. Outside the building, near an entryway, a fanny

pack and what appeared to be the remains of a coat were found on the ground. Investigators recovered a scarf and fanny pack wrapped inside a charred "puffy type" winter coat and a set of keys to the premises that was "still in the lock." The fanny pack contained a loaded handgun and Gaudreau's wallet, driver's license, pistol permit, eyeglasses, a cigarette butt, and about $493. The jacket pockets contained a small can of lock deicer, business cards, and a lighter. Burned matter and charred debris in tissues in a bathroom wastebasket were also seized from Gaudreau's home, even though the accelerant detection dog never alerted to anything in the house.

Curran later testified that it was his opinion that, to a reasonable degree of scientific certainty, there were four separate areas of origin for the fire and the cause was an intentional act of fire setting. He opined that:

> "the gasoline had been introduced into the trash cans, and even the gas cans were left behind within these trash cans. And at that point, a piloted flame or a match or a cigarette lighter, more than likely a match, * * * was brought into contact with the contents of the trash cans and the gasoline."

When he was cross-examined at trial, Det. Matook[3] admitted that, although he seized several items—a gas can, rag, and burned fabric found in the car; the tissues and burnt matter found in the bathroom; a cigarette butt found in the burned jacket—he had not submitted any of those seized items to the state crime lab for analysis for accelerants or for DNA testing. He also conceded that the police did not dust for fingerprints at Gaudreau's house; they had not obtained financial documents from defendant's house or contacted Citizens Bank about Gaudreau's bank account; they never investigated whether he was current on his mortgage, nor had they sought to obtain security footage from gas stations that were located near Gaudreau's home and business.

---

[3] Detective Feeley retired shortly after the gym fire and Det. Matook replaced him as lead detective on the case.

Kim Freeland, of the Rhode Island state crime laboratory, testified that several samples from the fire scene had tested positive for gasoline and other types of volatile components. Kevin Murphy, a senior fire investigator with the Rhode Island State Fire Marshal's office, said that he had examined the electrical service and concluded that the cause of the fire was not electrical.

## The Trials

On July 2, 2009, Gaudreau was charged by indictment with first-degree arson (count 1) and knowingly making a false statement of a crime in violation of G.L. 1956 § 11-32-2 (count 2). Pretrial motions were heard before a justice of the Superior Court on November 14 and 15, 2012. The trial justice severed the two counts for trial and proceeded on the arson charge to ensure that defendant was not prejudiced by the state's allegations that he made a false claim to the police when he reported the breaking and entering at his home.

The defendant sought, in limine, to suppress the videotaped interrogation on the grounds that comments by the detectives on the tape were irrelevant and highly prejudicial, and constituted inadmissible testimony concerning witness credibility. During a lengthy argument about the video spanning two days, defendant requested that, if the tape was not suppressed entirely, then it should be redacted and the jury should be given a cautionary instruction about the detectives' comments. The trial justice denied defendant's motion to suppress, but ordered that two lines at the end of the tape—about the veracity of the snowplow driver—be redacted. On the day that the tape was to be played before the jury, defendant again raised an objection to

the videotape and again requested a cautionary instruction. The trial justice decided to give a brief instruction just before the video was played, explaining the context of the interrogation.[4]

However, that trial ended in a mistrial because the jury was unable to reach a verdict. A second jury trial began before a second trial justice in September 2013. The parties agreed that the evidentiary rulings from the first trial would constitute the law of the case and that the exhibits marked as full in the first trial would be admitted as full exhibits in the second trial. The defendant requested that the trial justice acknowledge his objection on the record to the

---

[4] The trial justice gave the following cautionary instruction, to which there was no objection, before the videotaped interrogation was played for the jury:

> "I just want to take a moment to explain what is going to be played for the jury at this time. As you just heard this [o]fficer explain to you, this is a videotaped interview that was conducted at the request of the defendant Mr. Gaudreau in this case and I just want to give you a little orientation to that.
>
> "Obviously, this is at the police station. You have seen a lot of these through popular culture and TV and movies. Other than when attorneys make closing arguments to a jury, I think the most frequent thing you see is police interrogations or police interviews of suspects of crimes. So that is what you are going to be seeing here, and I just want you to understand that you should evaluate it like you would anything else in this case. You look at the totality of the circumstances.
>
> "You look at what is being said, who is saying what and I want you to understand that that particular process and the protocols that are used in that setting are vastly different than what you might see obviously here in the courtroom, the way the people question or any other place; it is a uniquely designed kind of exchange and interview between the police and the suspect. And, I just want you to keep your minds open and you should evaluate it by the totality of what is going on once this officer has completely testified in direct and cross-examination by defense counsel so keep your minds open. All right."

admission of the video recording of the interrogation, but he did not reassert his request for a cautionary instruction.[5]

At the second trial, in addition to the testimony of police and fire investigators, the state presented testimony from Karen Kane-Taylor, who worked for defendant at the gym in return for membership. Ms. Kane-Taylor identified the puffy jacket and scarf that were found at the scene as belonging to defendant and said that he wore them on a daily basis. She also testified that, in the weeks leading up to the fire, it seemed to her that products that were sold at the gym, such as protein bars, drinks, water, and magazines, were not being replenished.

The defendant testified in his own defense. He said he had owned Physique Gym for twenty-three years and that there were about 400 members as of March 2009. He testified that revenue was generated from membership and from selling nutritional supplements and other products and that his bills were current and his accounts were balanced. He said that he burned his legs at home in the early morning hours of March 1, 2009, the night before the gym fire, when an oil lamp he was filling spilled and caught on fire. He said that he told the police the burns on his legs were a rash because "they were claiming that I set fire to my gym. I said[,] 'Uh oh. If they see my legs, they're going to think I burned myself setting fire to the gym.' I just came up with the first thing off the top of my head was, oh, it's a rash."

The defendant reiterated much of the story that he had repeatedly told the police, with various deviations. He said that the night before the fire, he was at home until about 9:30 p.m., at which time he went to the bank to make a deposit. He said he continued on to the gym to repair equipment and to paint an office door. He said it was common for him to be at the gym at

---

[5] The parties also agreed to redact additional "bolstering" comments by the detectives about the snowplow driver on the videotape and in the transcript. Those statements are not at issue in this appeal.

night because he could only repair equipment when the gym was closed and there were no members waiting to use equipment. He testified that he parked his car right in front of the gym and backed up to the door. He could not recall what time he left; however, he recalled that a snowplow driver waved him through the intersection at Columbus Avenue and Newport Avenue when he was on his way home. He said that he was home for a little while, but, because he was unable to sleep, he went out for a ride. This, he said, was a normal practice for him. He testified that he drove to the Seekonk-Attleboro area "[b]ecause the roads are better plowed in Massachusetts." He claimed that he arrived back at home just before 3:50 a.m. and discovered the break-in at his home.

The defendant testified that he had his fanny pack with him when he went to the gym on the day of the fire, but he took it off when he got home, and he did not take it with him when he went on his late-night sojourn to Massachusetts. He testified that he left the fanny pack on a hassock in the living room. He said he discovered that the Plexiglas window in his back door was broken when he returned. He said he called the police immediately after noticing that the fanny pack was missing as soon as he entered the house. However, he also testified that he soon received a call notifying him about the fire at the gym. Finally, defendant said that he owned several winter coats, including the coat and scarf that had been found at the scene, but that he kept that coat and scarf at the gym and wore a black fabric coat on Sundays.

At the conclusion of the evidence, the jury returned a guilty verdict for first-degree arson. The defendant's motion for a new trial was denied, and he timely appealed.

The defendant raises two issues on appeal. First, he argues that the first trial justice abused his discretion when he refused to exclude or redact the videotaped interrogation under Rules 401 and 403 of the Rhode Island Rules of Evidence, because the detectives' statements

expressing disbelief in his story were both irrelevant and inadmissible comments on defendant's credibility. He further argues that any possible relevance was substantially outweighed by its enormously prejudicial impact because the jury repeatedly heard the detectives call defendant a liar.

Second, defendant argues that the trial justice erred in denying his motion for a new trial because there was no evidence linking him to the fire and, in particular, no evidence of an accelerant on his clothing, in his house, or in his car.

## 2

## Discussion

## A

## Videotaped Interrogation

The defendant argues that the first trial justice abused his discretion when he denied his motion in limine to either suppress or redact the recorded police interrogation. He maintains that the videotaped interrogation had no probative value because it did not contain a confession and because the detectives' repeated accusations that defendant was lying were the equivalent of credibility testimony, which is absolutely prohibited from a witness. The defendant further argues that the prejudicial impact of the police officers' comments outweighed any minimal relevance that the tape might have had because they do not provide context, because defendant did not change his story during the course of the interview.

The state argues, as it did in the trial court, that defendant's statements were relevant as an "adamant" and "false" denial, which is evidence of guilt. The state further argues that the detectives' comments were typical interrogation techniques that the jury was familiar with, and

that those statements were not equivalent to testimony from the detectives on the stand and were therefore not prejudicial to defendant.

## i

### Standard of Review

"It is well established that decisions concerning the admissibility of evidence are 'within the sound discretion of the trial justice, and this Court will not interfere with the trial justice's decision unless a clear abuse of that discretion is apparent.'" State v. Gaspar, 982 A.2d 140, 147 (R.I. 2009) (quoting State v. Mohapatra, 880 A.2d 802, 805 (R.I. 2005)). "[This] abuse-of-discretion standard includes review to determine that the discretion was not guided by erroneous legal conclusions." Sweet v. Pace Membership Warehouse, Inc., 795 A.2d 524, 527 (R.I. 2002) (quoting Votolato v. Merandi, 747 A.2d 455, 460 (R.I. 2000)). "The trial justice will not have abused his or her discretion as long as some grounds supporting his or her decision appear in the record." State v. Reyes, 984 A.2d 606, 615 (R.I. 2009) (quoting State v. Evans, 742 A.2d 715, 719 (R.I. 1999)).

## ii

### Analysis

The parties battled over the admissibility of the videotape over two days, and it is significant that defendant repeatedly argued that he was not challenging his own comments on the tape being shown to the jury, but was instead arguing that the detectives' comments were irrelevant and highly prejudicial. However, the first trial justice denied defendant's motion with the following explanation:

> "My basis for allowing the video to be played in the [s]tate's case is that the [c]ourt finds that the video statement is relevant and probative. Having viewed it several times now, the [c]ourt finds that the video contains what can be viewed depending

- 14 -

on again the jury's assessment of the evidence but certainly there are statements in this video that can be viewed as false statements made by this defendant in the hopes of extracting himself from suspicious circumstances.

"That type of situation was addressed in State v. Diaz[, 654 A.2d 1195 (R.I. 1995)] and specifically on [p]age 1204, the Court discussed a similar situation involving false statements by a defendant.

"In that case our Supreme Court found that such false statements alone are insufficient, insufficient proof to sustain the conviction.  However, they do provide circumstantial evidence of a consciousness of guilt and have independent probative force or value."

The trial justice, having found defendant's statements relevant, made no findings in response to defendant's argument that the detectives' comments were irrelevant, nor did he address defendant's motion on the basis of Rule 403.

During the second trial, the parties agreed that the evidentiary rulings on defendant's motions in limine during the first trial were the law of the case and, as a result, the second trial justice made no independent findings on the videotape's admissibility.

The issue that this Court must grapple with is novel.  Although we have not yet adopted a rule requiring that all police interrogations be audio or video recorded, several organizations within the state have either adopted such rules or have recommended that police departments adopt them.[6]  Now, as more interrogations are being recorded, this Court is faced with new issues that are associated with those recordings.

---

[6] See, e.g., Task Force to Investigate & Develop Policies & Procedures for Electronically Recording Custodial Interrogations, Final Report (Feb. 1, 2012), available at https://www.ribar.com/UserFiles/FINAL-REPORT-MERI-TF.pdf (recommending that every law enforcement agency adopt uniform written policies and procedures requiring the electronic recording of custodial interrogations in their entirety); Rhode Island Police Accreditation Commission, RIPAC, Accreditation Standards Manual, Ch. 8, § 8.10 at 44-46 (May 2013),

Often, defendants move to suppress confessions that have not been recorded because "[b]oth the Rhode Island and the Federal Constitutions bar the use in a criminal trial of a defendant's involuntary statements." State v. Humphrey, 715 A.2d 1265, 1274 (R.I. 1998) (quoting State v. Griffith, 612 A.2d 21, 25 (R.I. 1992)). It is a frequent argument that a videotape is the best evidence of whether a defendant's inculpatory statements have met that test.

However, when a defendant does not challenge the admission of his own statements as being involuntary, but, as is the case here, seeks to suppress the statements of the police, trial courts must engage in a very different type of analysis. In these situations, it is our opinion that the evidence should be viewed like any other evidence; other grounds may exist for the introduction of such evidence, in its entirety or in a redacted form, pursuant to the Rhode Island Rules of Evidence. See Rule 402 of the Rhode Island Rules of Evidence ("All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by the constitution of Rhode Island, by act of congress, by the general laws of Rhode Island, by these rules, or by other rules applicable in the courts of this state. Evidence which is not relevant is not admissible.").

Several states have addressed the particular issue of whether a recorded interrogation is admissible when the defendant neither confesses nor challenges his statements as involuntary, but rather attacks the admissibility of comments made by police that are contained in the recording. The law is quite unsettled on this point, and there is a clear split in authority between the jurisdictions that have addressed the issue, with no apparent majority.

Some courts have found the evidence to be inadmissible opinion testimony that should not be admitted indirectly in the form of a recording, and they have held that such statements

available at http://ripolicechiefs.org/wp-content/uploads/2015/11/RIPAC_Accreditation_ Standards_Manual_First_Edition_May_2013.pdf (last visited April 13, 2016).

must be redacted. In other words, those jurisdictions have reasoned that if the police statements would not be admissible from the witness stand, they should not come in through the backdoor via a videotape. See State v. Elnicki, 105 P.3d 1222, 1224-25 (Kan. 2005); Commonwealth v. Kitchen, 730 A.2d 513, 521 (Pa. Super. Ct. 1999); State v. Demery, 30 P.3d 1278, 1285 (Wash. 2001); Sweet v. State, 234 P.3d 1193, 1198, 1199 (Wyo. 2010). Other courts have held that such statements from police during an interrogation should not automatically be excluded as opinion testimony, but, rather, must be analyzed under the existing rules of evidence. See People v. Musser, 835 N.W.2d 319, 329-30 (Mich. 2013) (finding that the probative value of the interrogator's statements was substantially outweighed by the danger of unfair prejudice, under Rule 403, and error was not harmless).

In Elnicki, 105 P.3d at 1224-25, the Supreme Court of Kansas addressed a similar issue in a trial for rape and sodomy, the only difference being that the defendant, throughout the interrogation and in later statements, repeatedly changed his story about the events of the night in question. The defendant told the police several varying versions of the facts, from having never seen the victim that night, to being too drunk to remember, to her agreeing to have oral sex for $25, and more variations, all the while denying that he committed rape. Id. The court held that, under its rules, a trial court has no discretion to allow one witness to testify about another's credibility, and so reviewed the admission of the tape de novo. Id. at 1226. The court then held that the trial court erred when it admitted the videotape, explaining the following:

> "A synthesis of the referenced case law leads us to conclude that it was error for Detective Hazim's comments disputing Elnicki's credibility to be presented to the jury. The jury heard a law enforcement figure repeatedly tell Elnicki that he was a liar; that Elnicki was 'bullshitting' him and 'weaving a web of lies.' * * * A jury is clearly prohibited from hearing such statements from the witness stand in Kansas and likewise should be prohibited from hearing them in a videotape, even if the

- 17 -

statements are recommended and effective police interrogation tactics. As far as context for Elnicki's answers are concerned, the State could have safely accomplished its goal simply by having Detective Hazim testify and point out the progression of Elnicki's various stories as the tape was played—minus Hazim's numerous negative comments on Elnicki's credibility. The absence of a limiting instruction merely compounded the already serious problem, misleading the jury into believing that Hazim's negative comments carried the weight of testimony." Id. at 1229.

Thus, even where the defendant's story shifted throughout the course of the interview, that court found that the statements of the detective on credibility were absolutely prohibited. Id.

Similarly, an intermediate appellate court in Pennsylvania held that videotaped comments by the police accusing the defendant of lying "were akin to a prosecutor offering his or her opinion of the truth or falsity of the evidence presented by a criminal defendant, and such opinions are inadmissible at trial." Kitchen, 730 A.2d at 521. The court held that each of the defendant's own statements made during the interrogation—wherein she admitted her relationship with the victim and the co-defendant, and to her presence at the scene, among other things—were relevant to determination of her guilt as an accomplice to the murder, and, therefore, analyzed the many statements of the police under Rule 403 of the Pennsylvania Rules of Evidence. Kitchen, 730 A.2d at 519-20. Ultimately, the court held that instances where police accused the defendant of lying, where the defendant did not respond to questioning, and where police stated that they had a strong case against the defendant had to be redacted. Id. at 521-23.

The Supreme Court of Wyoming analyzed whether the trial judge committed plain error in allowing the state to present improper vouching evidence of a deputy in a recorded video and in testimony from the stand that he met with the victim and that he believed she was being truthful in her accusation. Sweet, 234 P.3d at 1198-99. The court held that, although the

defendant had not objected to any of that evidence, the deputy's statements "violated in a clear and obvious way th[at] [c]ourt's long-standing rules prohibiting a witness to express opinions about the accused's mendacity and guilt and about the alleged victim's truthfulness and credibility * * *." Id. at 1204-05.

A majority of the Supreme Court of Washington held, in Demery, 30 P.3d at 1285, that an officer's accusations amounted to opinion evidence regarding the defendant's veracity should not have been admitted, but that the trial court did not commit reversible error in admitting the officer's accusations because of the wealth of evidence against the defendant. The four-justice minority, who opined that the evidence was admissible, rested their decision on the fact that the evidence was not "testimony" because it was neither given under oath nor from the witness stand, nor was it offered to prove the officer's opinion. Id. at 1280-85.

On the other hand, courts have found that statements made by officers during the course of an interrogation were not admitted in error. The majority of those courts held that the comments by law enforcement were probative because they provided context for the defendants' shifting stories during the course of the interrogations. See State v. Boggs, 185 P.3d 111, 121 (Ariz. 2008) (en banc) (holding that the defendant "cannot establish prejudice because he did, in fact, provide multiple stories about his involvement; the jury did not need [detective]'s comments to know that [the defendant] lied"); Lanham v. Commonwealth, 171 S.W.3d 14 (Ky. 2005); State v. Castaneda, 715 S.E.2d 290, 295, 296 (N.C. Ct. App. 2011) (the defendant's explanation of what happened when he stabbed the victim repeatedly shifted throughout his post-arrest interview; therefore, the detective's statements were probative to give context to the defendant's changing story and not substantially outweighed by unfair prejudice).

A small minority of states that have considered the issue have held that a police officer's statements have probative value for providing context even where the defendant, as here, made no inculpatory statements and had not changed his story during the interrogation. See Dubria v. Smith, 224 F.3d 995, 1001-03 (9th Cir. 2000) (no violation to fundamental due process, even though California law would have required that the tapes be redacted, because not every trial error constitutes a failure to observe fundamental fairness and because trial judge gave two specific instructions that cured prejudice); State v. Willis, 75 A.3d 1068, 1078 (N.H. 2013) (finding that probative value was not outweighed by the danger of unfair prejudice because the officer's comments were in the form of questions rather than accusations, and provided context for the defendant's responses).

In Lanham, 171 S.W.3d at 26, the Supreme Court of Kentucky reviewed the range of decisions that have addressed this issue, noting that "it is quite difficult to synthesize a majority rule, especially given that the evidentiary rules in these various states differ significantly." The court declined to adopt a rule that such evidence should be per se excluded as opinion testimony, reasoning that "[a]lmost all of the courts that have considered the issue recognize that this form of questioning is a legitimate, effective interrogation tool." Id. at 27. However, the court also "recognize[d] that the introduction of such comments, no doubt, entails the possibility that the jury will misunderstand and accord to those comments an impermissible weight during deliberation." Id. While specifically disagreeing with the Supreme Court of Kansas that the comments must be redacted, the court held that the appropriate remedy was for the court to provide the jury "a limiting admonition" "to inform the jury that the officer's comments or statements are 'offered solely to provide context to the defendant's relevant responses.'" Id. at 28 (quoting Demery, 30 P.3d at 1283) (emphasis added). The court remarked that most other

courts have endorsed such an admonition and that Rule 105 of the Kentucky Rules of Evidence specifically provides for it, so long as the defendant requests it.[7] Id.

With that somewhat disparate background in mind, we now turn to the issues in the case before us. The defendant proposes several grounds for his claim that the trial justice erred in denying his motion to suppress or redact those portions of the interrogation that feature the police challenging defendant's veracity about what he said he was doing the night of the fire. First, he argues that the evidence is inadmissible credibility testimony. See State v. Miller, 679 A.2d 867, 872 (R.I. 1996) ("Determination of the truthfulness or the credibility of witnesses is the exclusive province of a jury. * * * If the opinion testimony has the same 'substantive import' as if it squarely addressed and bolstered another witness's credibility, it is inadmissible."). Second, defendant argues that the statements had no relevance, under Rule 401, because the detectives' statements did not have any tendency to either prove or disprove that he committed the arson and, furthermore, their statements provided no context to defendant's statements because he never made any inculpatory statements or even shifted his story. Finally, defendant maintains that the statements of the detectives should have been excluded under Rule 403 because they were highly prejudicial due to the fact that the jury heard the same detective, who was on the stand while the video was played, repeatedly yell at defendant, call him a liar, and declare that his story was made up.

---

[7] See Lanham v. Commonwealth, 171 S.W.3d 14, 28 n.57 (Ky. 2005) (Rule 105 of the Kentucky Rules of Evidence says, "When evidence which is admissible as to one (1) party or for one (1) purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and admonish the jury accordingly. In the absence of such a request, the admission of the evidence by the trial judge without limitation shall not be a ground for complaint on appeal, except under the palpable error rule."). Kentucky's Rule 105 is different from Rhode Island's Rule 105 in that the Rhode Island Rule does not contain the second sentence on review under the palpable error rule. See Rule 105 of the Rhode Island Rules of Evidence.

As an initial matter, we must point out that the first trial justice's ruling to deny defendant's motion in limine addressed only the relevance of defendant's statements, even though defense counsel conceded that defendant was not challenging the admission of his own statements.[8] Although we can infer that the first trial justice was not persuaded by defendant's argument that the detectives' comments were per se inadmissible as credibility testimony, it also does not appear from the record that he articulated a ruling on either that argument or on the balancing test required by Rule 403. The trial justice's decision to admit the videotape was based solely on its probative value because he reasoned that, in the context of the entire case, the jury could conclude that defendant made false statements to the police, relying on our decision in State v. Diaz, 654 A.2d 1195 (R.I. 1995). We have held that failing to rule on an issue that has properly been raised is an error. See State v. Pona, 948 A.2d 941, 953 (R.I. 2008) ("Superior Court erred when it did not attempt to strike a balance between the necessity of admission and the danger of unfair prejudice"); see also Power v. City of Providence, 582 A.2d 895, 900 (R.I. 1990) (in the civil context, "[t]he trial judge erred in failing to rule on the legal question of whether the settlement agreement is invalid on the basis that it contravenes the act").

Nevertheless, to the extent that the comments from the officers may have prejudiced defendant, we conclude that the admission of such evidence—when viewed in light of the other overwhelming evidence against him—was harmless. We "will not disturb the trial justice's ruling unless the abuse of discretion [or error] resulted in prejudicial error." State v. Ceppi, 91 A.3d 320, 331 (R.I. 2014). "In order to meet the harmless-error test, there must be proof

---

[8] Defense Counsel: "Not everything is admissible. Rules of evidence tell us what is admissible and what is not admissible and the opinions of police officers whether as to the character of somebody else or the hearsay statements, that[,] Judge[,] is objectionable. That is what we are saying, can a police officer testify to what Mr. Gaudreau told him? Absolutely. Because Rule 801 [of the Rhode Island Rules of Evidence] let's them [sic]. Do we continue to bypass the rules because we have a videotape?"

'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" State v. Mercurio, 89 A.3d 813, 822 (R.I. 2014) (quoting State v. Smith, 446 A.2d 1035, 1036 (R.I. 1982)).

Our longstanding rule prohibiting credibility testimony is "that no witness, expert or otherwise, may testify that another witness is lying or faking." State v. Tavares, 590 A.2d 867, 870 (R.I. 1991). We have held that credibility-bolstering testimony by a witness during trial is impermissible, "even if the witness does not literally state an opinion concerning the credibility of another witness's testimony." State v. Lassiter, 836 A.2d 1096, 1107 (R.I. 2003). However, if such testimony is impermissibly admitted, this Court reviews the trial justice's decision to admit the testimony for prejudicial error. State v. Rushlow, 32 A.3d 892, 899 (R.I. 2011). In Rushlow, we declined to vacate the conviction because a police officer's testimony about the complaining witness's sincerity was "brief and without follow-up," and the complaining witness was extensively cross-examined, which "provided the jury with 'ample opportunity to form an independent opinion' about her credibility." Id. at 900 (quoting State v. Higham, 865 A.2d 1040, 2046 (R.I. 2004)).

Because the statements by the detectives in this case were made during the course of an interrogation, it goes without saying that they were not spoken by a witness under oath during trial and, therefore, did not constitute "testimony," as that term has traditionally been defined. Black's Law Dictionary 1704 (10th ed. 2014) ("Evidence that a competent witness under oath or affirmation gives at trial or in an affidavit or deposition."). We agree with those states that have concluded that such evidence is not strictly controlled by the rules on opinion testimony and should, therefore, be analyzed for its admissibility under Rules 401 and 403.

Rule 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice * * *." We have held that "Rule 403 may be invoked to exclude evidence that is prejudicial to [the] defendant to the extent that the negative effect outweighs its probative value. Such evidence is rendered inadmissible if it is prejudicial and irrelevant." State v. Grayhurst, 852 A.2d 491, 505 (R.I. 2004) (quoting State v. Grundy, 582 A.2d 1166, 1172 (R.I. 1990)).

"When a defendant objects to a remark as prejudicial, the trial justice is obliged to evaluate the potential prejudice of the statement or question on the outcome of the case by examining the statement in its factual context." State v. Gomes, 764 A.2d 125, 136 (R.I. 2001) (quoting State v. Fernandes, 526 A.2d 495, 498 (R.I. 1987)). "[P]rejudice exists when the challenged comment or question 'so inflames the passions of the jury as to prevent their calm and dispassionate examination of the evidence.'" Id. (quoting Fernandes, 526 A.2d at 498). "This Court has held that in order to show prejudice, a reasonable possibility must exist that the improper evidence contributed to a defendant's conviction." Id. (quoting State v. Robertson, 740 A.2d 330, 336 (R.I. 1999)). "In order to determine whether this reasonable possibility exists, we must decide what probable impact the improper evidence would have had on an average jury." Id. (quoting Robertson, 740 A.2d at 336). Also, we have cautioned that, to be excluded under Rule 403, evidence must be "marginally relevant and enormously prejudicial." State v. Patel, 949 A.2d 401, 413 (R.I. 2008).

In this case, the detectives repeatedly told defendant that "the jig is up," that he concocted the story, that he lied to them, and that he should express remorse. Much of the interrogation resulted in either nonresponsive answers or repeated denials from defendant. Indeed, the majority of the video and transcript, after the initial confrontation with the witness statement, are dominated by the comments of the two detectives, with defendant occasionally responding in the negative.[9] Because of the paucity of relevant or useful responses to be gleaned from defendant's consistent explanation of events and assertion of innocence, those officers' comments cannot be said to have had any contextual value. On the other hand, those comments certainly are prejudicial to defendant. The fact that the jury viewed a videotape of the very detective sitting on the witness stand telling defendant that he was a liar compounded the danger that the jury might have been prejudiced against defendant.

It is our view that defendant's videotaped statements to the police, including that he had driven around aimlessly during near blizzard conditions while his business was completely engulfed in flames, that he had neglected to take his keys, glasses, wallet, and driver's license with him, and that his home was broken into while he was gone, were far more prejudicial to him than anything said by his interrogators. Having that prejudice compounded by the eyewitness account of the snowplow driver, who was well acquainted with defendant, made the story that much less believable. Indeed, "[a]ll evidence tending to prove guilt in a criminal trial is prejudicial to a defendant." State v. Hak, 963 A.2d 921, 928 (R.I. 2009) (quoting State v. DeJesus, 947 A.2d 873, 884 (R.I. 2008)). And the statement from the snowplow driver, if believed by the jury, had some tendency to prove that defendant was the most likely cause of the

---

[9] The trial justice relied on State v. Diaz, 654 A.2d 1195 (R.I. 1995) when he decided that the interrogation was relevant. We have reviewed our holding in Diaz and do not agree that it is applicable.

fire. We are therefore unable to conclude that, in the factual context of this case, a reasonable possibility existed that the prejudicial effect of the officers' comments impacted the outcome of his trial.

Ultimately, it is our opinion that the trial justice should have conducted a balancing test and carefully weighed the low probative value of the recorded comments from the officers against the prejudicial impact to defendant. But, to the extent that there was any error in admitting the videotaped interrogation, we conclude that it was harmless. Viewing the prejudice against the tapestry of the factual evidence and bearing in mind the conduct, tone, and length of this particular interrogation, we cannot conclude that the passions of the jury would have been "so inflame[d] * * * as to prevent their calm and dispassionate examination of the evidence." Gomes, 764 A.2d at 136 (quoting Fernandes, 526 A.2d at 498).

Although we conclude that the videotaped interrogation admitted against this defendant was not so prejudicial as to require a new trial, we believe such evidence should be judiciously considered for its probative value when, as here, the defendant makes no inculpatory statements. We echo the observation of the Supreme Court of Kentucky that there is a real concern that these types of interrogations have the potential to lead to substantial prejudice, see Lanham, 171 S.W.3d at 28, and trial justices should be alert to the danger of potential abuse, such as the introduction of manufactured evidence that would not be admitted at trial. See Kitchen, 730 A.2d at 521 n.5 ("if the Commonwealth had no witnesses to produce in the instant case, then any comments to Appellee, on the videotapes, relating to witnesses would have to be redacted; the deception would be permissible, but it could not be displayed before the jury since the police comments would be irrelevant and prejudicial"). Police officers may employ many tactics and ruses that have been approved by this Court to maneuver a defendant into confessing, but those

tactics should not be shown to a jury unless to do so would be consistent with the rules of evidence.  See State v. Ramsey, 844 A.2d 715, 720 (R.I. 2004); State v. Marini, 638 A.2d 507, 513 (R.I. 1994).  This is especially so when a defendant has steadfastly maintained his innocence during questioning and has not changed his story during the course of the interrogation.  See Elnicki, 105 P.3d at 1224-25; Musser, 835 N.W.2d at 333; Demery, 30 P.3d at 1285; Sweet, 234 P.3d at 1198-99.

We finally note that defendants are entitled to a cautionary instruction, upon request, that the statements of the police are not to be taken for their truth.[10]  It is significant in this case that defendant asked for, and received, such a cautionary instruction during his first trial, but he did not request a cautionary instruction during his second trial.  If defendant had requested an instruction, the trial justice should have advised the jury of the context of an interrogation and admonished them that the tactics used by the police are not to be taken as evidence in and of themselves and that the credibility of all witnesses resides solely within their province.

**B**

**Motion for New Trial**

The defendant also argues that the trial justice erred in denying his motion for a new trial.  Before the trial justice, he argued that the verdict was against the weight of the evidence to convict him of starting the fire because there was no physical evidence linking him to the fire and, in particular, no evidence of an accelerant on his clothing or in his car or house.  He

---

[10] Rule 105 is directly on point here; it says: "When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly."  We believe that the detectives' comments that defendant was a liar, while not being true credibility "testimony," have the potential to invade the exclusive province of the jury and are not proper for that purpose; yet, those comments can be relevant for the purpose of providing needed context to defendant's relevant answers.

- 27 -

criticized the investigation conducted by Det. Feeley and Det. Matook as shoddy. He argued that the "jury found him guilty because the police, the prosecution and the jury thought his version of events [was] silly or improbable," and thus, he implored the trial justice to consider the evidence and grant him a new trial.

**i**

**Standard of Review**

"It is well settled that when reviewing a motion for a new trial, the trial justice must determine 'whether the evidence adduced at trial is sufficient for the jury to conclude guilt beyond a reasonable doubt.'" State v. Phannavong, 21 A.3d 321, 324 (R.I. 2011) (quoting State v. Peoples, 996 A.2d 660, 664 (R.I. 2010)). "Specifically, 'the trial justice must (1) consider the evidence in light of the jury charge, (2) independently assess the credibility of the witnesses and the weight of the evidence, and then (3) determine whether he or she would have reached a result different from that reached by the jury.'" State v. Heredia, 10 A.3d 443, 446 (R.I. 2010) (quoting State v. Texieira, 944 A.2d 132, 140 (R.I. 2008)). "If, after conducting such a review, the trial justice reaches the same conclusion as the jury, the verdict should be affirmed and the motion for a new trial denied." Id. "As long as 'the trial justice has complied with this procedure and articulated adequate reasons for denying the motion, his or her decision will be given great weight and left undisturbed unless the trial justice overlooked or misconceived material evidence or otherwise was clearly wrong.'" Phannavong, 21 A.3d at 325 (quoting Peoples, 996 A.2d at 664).

**Analysis**

When she considered defendant's motion for a new trial, the trial justice found the evidence against him to be "overwhelming" on each element of the crime. She found that the credible evidence suggested that the gym was not as successful a venture as defendant described and that defendant executed a plan to, in essence, "sell" his gym to his insurance company for profit. The trial justice concluded that the evidence established beyond a reasonable doubt that he set the fire willfully. Although the trial justice found that the police investigation "wasn't perfect," she nonetheless determined that the officers who testified for the state were credible. Despite her conclusion that, from an investigatory perspective, more could have been done, "they did a sufficient job to convince [her] and apparently to convince the jury beyond a reasonable doubt that the [d]efendant planned and carried out the crime." Critically, the trial justice also found that defendant's version of events leading up to the time when Officer Dolan arrived at defendant's home "lacked believability" and made no sense.

With respect to the eyewitness, the trial justice found that Paul Richard was a "credible witness even though he didn't appear to be very sharp. He almost appeared a bit ditsy * * *." Despite his flaws as a witness, the trial justice concluded that there was no question that he was plowing snow in the area that evening and that he reported seeing defendant at Physique Gym to the police the next morning.

The trial justice also found George Gardinar to be a credible witness. She found his testimony to be significant in establishing that he had no motive to burn his property because he had allowed the insurance on the building to lapse. She remarked that "[i]t was clear from his appearance on the witness stand he suffered a significant financial loss * * * and he looked

pained." The trial justice also believed the testimony of Karen Kane-Taylor, who identified defendant's jacket and scarf found at the scene, remarking that this witness was particularly credible because she appeared to like defendant. The trial justice accepted Ms. Kane-Taylor's testimony that inventory was not being replenished in the weeks leading up to the fire.

The trial justice determined that the jury was justified in concluding that, although the accelerant-sniffing dog did not detect an accelerant anywhere other than in the gym, that "did not exonerate the [d]efendant or diminish a strong case against him." The judge found that the burns discovered on his legs "and [d]efendant's ludicrous explanation of how he sustained them may have been some of the strongest items of evidence against the [d]efendant." Finally, the trial justice found that defendant lied on the stand, that his financial position was not what he explained it to be, as evidenced by the large mortgage on his modest house, and that he must have decided that as he aged, he needed financial security, which he tried to achieve by "sell[ing] his business to the insurance company for a hefty sum of $125,000 * * *." She concluded that, if she had been sitting without a jury, she would have found defendant guilty of first-degree arson.

In our opinion, the trial justice more than met her obligations to consider the evidence in light of the jury charge, independently assess the credibility of the witnesses, and determine that she agreed with the jury's ultimate verdict. As we have said,

> "when a defendant elects to testify, he runs the very real risk that if disbelieved, the trier of fact may conclude that the opposite of his testimony is the truth. * * * 'A trier of fact is not compelled to accept and believe the self serving stories of vitally interested defendants. Their evidence may not only be disbelieved, but from the totality of the circumstances, including the manner in which they testify, a contrary conclusion may be properly drawn.'" State v. Mattatall, 603 A.2d 1098, 1109 (R.I. 1992) (quoting United States v. Cisneros, 448 F.2d 298, 305 (9th Cir. 1971)).

That is apparently exactly what happened when the trial justice concluded that the defendant's explanations for how he got burned, why he was driving in the middle of a snowstorm, and how his fanny pack was stolen, were "ludicrous" and quite a "coincidence." We cannot fault the trial justice's difficulty in believing the defendant's explanation of such exceptional coincidences, and hold that the trial justice acted well within her discretion to reject the defendant's testimony as incredible. Thus, we cannot determine that the trial justice misconceived or overlooked material evidence and discern no error in the denial of the motion for a new trial.

**3**

**Conclusion**

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court. The record is remanded to that tribunal.



# RHODE ISLAND SUPREME COURT CLERK'S OFFICE

## Clerk's Office Order/Opinion Cover Sheet

**TITLE OF CASE:**        State v. Gary Gaudreau.

**CASE NO:**        No. 2014-78-C.A.
                              (P1/09-2058A)

**COURT:**        Supreme Court

**DATE OPINION FILED:**    June 16, 2016

**JUSTICES:**        Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**        Associate Justice Francis X. Flaherty

**SOURCE OF APPEAL:**    Providence County Superior Court

**JUDGE FROM LOWER COURT**:

              Associate Justice Netti C. Vogel

              Associate Justice Daniel A. Procaccini

**ATTORNEYS ON APPEAL:**

              For State:  Virginia M. McGinn
                    Department of Attorney General

              For Defendant:  Catherine Gibran
                    Office of the Public Defender